Paul J. KEOHANE, Petitioner/Cross–Respondent,

v.

Stephen STEWART, Cross–Petitioner,

and

Grover K. Wilkerson and Terri Campbell, Respondents.

No. 93SC382.

Supreme Court of Colorado, En Banc.

July 11, 1994.

Rehearing Denied Sept. 6, 1994.

Paul J. Keohane, pro se.

Holland & Hart, A. Bruce Jones, Alan N. Stern, Stephanie D. Welsh, American Civil Liberties Union, David H. Miller, Denver, for cross-petitioner and respondents.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *Keohane v. Wilkerson*, 859 P.2d 291 (Colo.App.1993), in which the court of appeals held that the plaintiff's defamation claim against a newspaper and the author of two articles was not actionable but that the defamation claim against Stephen Stewart, a city councilman, was actionable. The court of appeals also held that there was sufficient evidence in the record to support an award of damages against Stewart. We affirm the court of appeals.

### I

Dr. Michael Gallagher was charged with sexually assaulting an anesthetized sixteen-year-old female patient at St. Thomas More Hospital on October 15, 1987. According to the allegations, anesthesiologist Dr. Gallagher masturbated and ejaculated into the patient's mouth during surgery. According to the *Cañon City Daily Record* and other regional newspapers, evidence suggested that Gallagher was guilty of sexual assault. For example, the papers reported: Gallagher destroyed his scrub suit before the crime was reported to the police; DNA testing revealed that the chances were one in 4.7 billion that someone other than Gallagher committed the assault; and Gallagher revealed his actions to another doctor and asked him not to disclose the crime.

After criminal charges were filed against Dr. Gallagher, the case was assigned to Judge Paul J. Keohane, a district court judge in the 11th Judicial District. Dr. Gallagher waived a jury and opted for trial to the court. Judge Keohane had represented St. Thomas More Hospital from 1965–1980, but did not recuse himself. He did, however, disqualify a deputy district attorney whose wife was a hospital employee. After the prospect arose that Judge Keohane might not be able to

preside over the case due to an injury that required surgery, Dr. Gallagher requested a continuance. Judge Keohane was, however, able to preside over the case shortly after his surgery. The *Cañon City Daily Record* and other newspapers published these factual and procedural details regarding Judge Keohane's decisions to remain the judge presiding over Dr. Gallagher's trial.

After Dr. Gallagher's trial began, Dwight Jurgens, a reporter for the *Cañon City Daily Record*, heard Cañon City Councilman Stephen Stewart comment: "That's the best judge money can buy." Jurgens subsequently published an article about the Gallagher trial which included Stewart's remark.

On November 3, 1987, Judge Keohane found Dr. Gallagher not guilty by reason of impaired mental condition and ordered Dr. Gallagher to report to a state mental institution. Judge Keohane did not impose a prison sentence. There was widespread outrage among the citizens of Cañon City about the outcome of the Gallagher trial.

After the verdict in the Gallagher trial was announced, Stewart approached Jurgens and asked him: "What do you think, was [Judge Keohane] paid off in drugs or money?" and "Do you think he was paid off in cash or cocaine?" These remarks were not published in the newspaper.

On November 8, 1988, the day of Judge Keohane's retention election, two letters written by Terri Campbell, a retiree and resident of Cañon City, appeared under assumed names in the *Fremont Observer*, a local weekly newspaper. The letters did not refer to Judge Keohane by name, but did refer to collusion and pay-offs between judges and doctors.[1] A few days after the trial was completed, Judge Keohane appeared on the ballot and before the electorate for retention. The citizens of the 11th Judicial District voted not to retain Judge Keohane in office.

 After the loss of his retention election, Keohane filed a defamation action against thirteen defendants including Stew-

---

1. Both letters relate to the same episode.

art,[2] Campbell, and Grover Wilkerson, the editor of the *Fremont Observer*. At the conclusion of the trial, only the claims against Stewart, Campbell, and Wilkerson were submitted to the jury. The trial court instructed the jury that Stewart's statements constituted slander per se. With respect to Campbell's letters, the court instructed the jury as to libel per quod.[3] The jury returned verdicts in favor of Judge Keohane, awarding him $15,000 in compensatory damages and $5,000 in punitive damages against Stewart, $25,000 in compensatory damages and; $1,000 in punitive damages against Campbell; and $25,000 in compensatory damages and $2,500 in punitive damages against Wilkerson. The punitive damages award against Stewart was subsequently reduced to $2,500 by the trial court.

On appeal, the court of appeals concluded that the letters written by Campbell and published by Wilkerson were constitutionally protected and thus not actionable in a defamation action. It also concluded that Stewart's remarks were not constitutionally protected because "a reasonable person could conclude that Stewart was implicitly asserting as actual fact that Judge Keohane had accepted a bribe based upon undisclosed facts known to him as a city councilman." *Keohane*, 859 P.2d at 291.[4] The court of appeals also held that the evidence was sufficient to permit the jury to conclude that Judge Keohane suffered actual damages as a result of Stewart's comments to Jurgens.

## II

The respondents assert that their respective statements are not actionable because they are constitutionally protected under the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution. Therefore, we first consider the standards for determining the actionability of a defamation claim.

In *Burns v. McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983), this court set forth the standard for determining the actionability of a defamation claim. The *Burns* standard was subsequently fortified by *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), which eliminated the arbitrary distinction between statements of fact and statements of opinion. The respondents assert that because their communications are statements of opinion, they are constitutionally protected speech. We are not persuaded.

Defamation is a communication that holds an individual up to contempt or ridicule thereby causing him to incur injury or damage.[5] *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 111, at 771–85 (5th ed. 1984). At common law, the tort of defamation existed to redress and compensate individuals who suffered serious harm to their reputations due to the careless or malicious communications of others. *See Milkovich*, 497 U.S. at 11, 110 S.Ct. at 2702 ("Since the latter half of the 16th century, the common law has afforded a cause of action for damage to a person's reputation by the publication of false and defamatory statements."); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 3007–08, 41 L.Ed.2d 789 (1974) (stating that the legislature has an interest in protecting and compensating individuals who are harmed by defamation). A cause of action for the tort of defamation exists today to protect individuals from those who would inflict an invidious and careless harm: "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic

---

2. Keohane's claim against Stewart for slander was based solely on the remarks made by Stewart to Jurgens after the verdict was announced and not on the published remark that Keohane was the "best judge money can buy."

3. A statement is libel per quod if it requires innuendo or extrinsic evidence to establish its defamatory nature. *Burnstein v. Dun & Bradstreet, Inc.*, 149 Colo. 150, 368 P.2d 780 (1962).

4. The court of appeals also held that the trial court properly instructed the jury that Stewart's comments were slanderous per se. We denied certiorari on this issue and thus it is not before us for review.

5. The tort of defamation consists of two types of communication, libel and slander. Libel is usually a written communication while slander is generally an oral communication.

concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92–93, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring). Additionally, defamatory statements are so egregious and intolerable because the statement destroys an individual's reputation: a characteristic which cannot be bought, and one that, once lost, is extremely difficult to restore.[6] *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 152, 87 S.Ct. 1975, 1990, 18 L.Ed.2d 1094 (1967) (noting that libel is as serious as the keeping of dangerous animals and the use of explosives); *Hayes v. Todd*, 34 Fla. 233, 15 So. 752, 755 (1894) (discussing why there is such a compelling interest in preventing and redressing attacks upon an individual's reputation). Additionally, a defamatory statement is an action over which the defamed individual has little control. *See generally* Diane L. Zimmerman, *Curbing the High Price of Loose Talk*, 18 U.C.Davis L.Rev. 359, 360 (1985) ("In modern times, the potential for the careless, or worse, the intentional falsehood to destroy livelihoods, disrupt families, and damage friendships has been viewed almost without exception by English and American judges as so serious a wrong that no judicial system would dare abandon a remedy for it."); Joan E. Schaffner, Note, *Protection of Reputation Versus Freedom of Expression: Striking a Manageable Compromise in the Tort of Defamation*, 63 S.Cal.L.Rev. 435, 440 (1990) (stressing the importance of redressing libelous injury).

▪ Weighed against the individual's right to be free from false and defamatory assertions, however, is society's interest in encouraging and fostering vigorous public debate. Public debate is crucial to modern society because "the ultimate good desired is better reached by free trade in ideas ... the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). In order to balance these competing needs, the privilege of "fair comment" was incorporated into the law of defamation. "Fair comment" protected statements that "concerned a matter of public concern, was upon true or privileged facts, represented the actual opinion of the speaker, and was not made solely for the purpose of causing harm." *Milkovich*, 497 U.S. at 13–14, 110 S.Ct. at 2703.

The protection afforded to statements which "represented the actual opinion of the speaker" reached its high-water mark as a result of dicta in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974). In *Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3006–07, the United States Supreme Court stated:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

The *Gertz* dicta was read by many courts to establish that statements of opinion are not actionable. *See, e.g., Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280 (4th Cir.1987); *Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *see also Ollman v. Evans*, 750 F.2d 970, 974 n. 6 (D.C.Cir.1984) (citing federal cases recognizing an opinion privilege), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); Jeffrey E. Thomas, Comment, *Statements of Fact, Statements of Opinion, and the First Amendment*, 74 Calif.L.Rev. 1001, 1009 n. 52 (1984) (listing state cases recognizing an opinion privilege).

---

6. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 12, 110 S.Ct. 2695, 2702, 111 L.Ed.2d 1 (1990), Chief Justice Rehnquist, writing for the Court, quotes a passage from act III, scene 3 of William Shakespeare's *Othello*. This passage artfully describes the harm caused by a defamatory statement:

> Good name in man and woman, dear my lord,
> Is the immediate jewel of their souls.
> Who steals my purse steals trash;
> 'Tis something, nothing;
> 'Twas mine, 'tis his, and has been slave to thousands;
> But he that filches from me my good name
> Robs me of that which not enriches him,
> And makes me poor indeed.

This court in *Burns* and the United States Supreme Court in *Milkovich*, however, specifically noted that there was no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705; *Burns*, 659 P.2d at 1358 (noting that *Gertz* did not immunize all forms of opinion). The Court in *Milkovich* reasoned that in order to insure "uninhibited, robust, and wide-open" debate on matters of public concern, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation," or which "cannot 'reasonably [be] interpreted as stating actual facts' about an individual," continues to receive full constitutional protection. *Milkovich*, 497 U.S. at 20, 110 S.Ct. at 2706 (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), and *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)).

 *Milkovich* and *Burns* thus provide the necessary framework to determine if a statement is protected.[7] This framework involves two inquiries.[8] The first inquiry is whether the statement is "sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 497 U.S. at 21, 110 S.Ct. at 2707. The second inquiry is whether reasonable people would conclude that the assertion is one of fact.[9] *Id.* The factors relevant to the second inquiry are: (1) how the assertion is phrased; (2) the context of the entire statement; and (3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed. *Burns*, 659 P.2d at 1360; *see Milkovich*, 497 U.S. at 20, 110 S.Ct. at 2706–07 (holding that loose, figurative, or hyperbolic language may indicate that the statement could not reasonably be interpreted as a statement of fact); *Falwell*, 485 U.S. at 50, 108 S.Ct. at 879 (noting that the statement as a whole as well as the broader social context must be considered); *see also Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler*, 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974); *White v. Fraternal Order of Police*, 909 F.2d 512, 516 (D.C.Cir.1990) (stating a court must examine the entire context of a publication and the dramatic intonations of the speaker). The factors are essential to insure that society's desire to protect speech and robust public debate does not create a license to commit character assassination.

## III

 Judge Keohane asserts that the court of appeals erred in concluding that Campbell's letters are constitutionally privileged. We disagree.

Campbell's letters, while published in the same edition of the *Fremont Observer*, ap-

---

7. Many courts have set out slightly different tests for determining if a statement is protected. *See* John E. Nowak & Ronald D. Rotunda, *Treatise on Constitutional Law Substance & Procedure* § 20.33 at 207–08 (2d ed. 1992) (listing cases); *Post-Milkovich Defamation: Is Everyone Still Entitled To Their Opinion?*, 65 St. John's L.Rev. 1105, 1112–14 (1991) (setting forth ways in which different courts have applied *Milkovich*); *Libel Law—Opinion Privilege*, 104 Harv.L.Rev. 219, 225–26 (1990) (noting lower court tests). The Supreme Court has noted that states are entitled to establish their own laws for redressing injury caused by defamation. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347–48, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974) (A showing of fault to impose liability for defamatory statements "recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation.").

8. Whether allegedly defamatory language is constitutionally privileged is a question of law and a reviewing court must review the record de novo to insure that the trial court's judgment does not constitute a forbidden intrusion on the field of free expression. *Milkovich*, 497 U.S. at 17, 110 S.Ct. at 2704–05; *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958–59, 80 L.Ed.2d 502 (1984); *Kuhn v. Tribune-Republican Publishing Co.*, 637 P.2d 315, 318 (Colo.1981).

9. The reasonable person standard does not require that a majority of the community consider the statement a defamatory assertion of fact. "It is only necessary that the plaintiff be prejudiced in the eyes of a 'substantial and respectable minority' of the community." *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351, 1357 (Colo.1983), quoting Restatement (Second) of Torts § 559, cmt. e (1976).

peared on separate pages, under different headlines, and under different pen names. Thus, each letter constitutes a distinct statement and must be assessed independently. *See Spears Free Clinic & Hosp. for Poor Children v. Maier*, 128 Colo. 263, 261 P.2d 489 (1953) (holding that each publication of a liable is a separate cause of action and should be separately pleaded).

## A

■ Campbell's first letter, under the headline "Sick Pillars of the Community," appeared on page twelve of the November 8, 1988, edition of the *Fremont Observer*. In the Sick Pillars letter, Campbell poses a series of questions concerning the existence of a conspiracy as an explanation for how local "sickies" who practice medicine escape punishment for their crimes. The letter states: "It's bad enough for these criminal acts to have occurred, but for his fellow appointed 'pillar' to let him off with nothing as punishment, makes you wonder who is the sickest!" The letter also alleges that the legal and medical professions are corrupt, refers to "the rackets that are pulled in courtrooms and all the payoffs," and asserts that this corruption prevents professionals from policing their colleagues: "Does anyone seriously think there was any thing besides a conspiracy between the 3 Psychiatrists which are fellow doctors, the officer of the court and defense, to do anything but let this man off." The letter identifies money as the motive for the conspiracy, questions why the prosecutors in the Gallagher trial did not demand a jury, remarks that a bench trial "always means the judge has total control of the verdict," and states that under the circumstances, "did anyone expect that a guilty verdict would not be rendered?" Campbell closes the letter by stating: "When looking at a bucket of scrub water, you'll notice scum always rises to the top, and so it goes, it appears, in the social ladder of this community."

■ We conclude, as did the court of appeals, that the Sick Pillars letter contains a number of statements of verifiable fact about Judge Keohane.[10] For instance, the letter alleges that a conspiracy existed between Judge Keohane, three expert witnesses, and the defense to "let off" the defendant in the Gallagher trial. Further, the letter states that the motivation for the conspiracy was money. Both of these statements are capable of being proved true or false.

However, we also conclude that these statements, when viewed in the context of the letter as whole, cannot reasonably be interpreted as stating actual facts about Judge Keohane.[11] First, much of the letter is couched in terms of speculation and conjecture. For example, the letter states that "A community ... would have to be even sicker" to retain an officer of the court who is guilty of participating in the activities described in the letter. Similarly, many of the facts asserted by Campbell are presented as conjecture about the events under discussion, i.e., "makes you wonder," "it appears," and "It [is] obvious."

The letter is replete with the sort of "imaginative expression" and "rhetorical hyperbole" the Supreme Court has regarded as particularly worthy of constitutional protection. *See Milkovich*, 497 U.S. at 20, 110 S.Ct. at 2706–07; *Falwell*, 485 U.S. at 46, 108 S.Ct. at 876; *Letter Carriers*, 418 U.S. at 264, 94 S.Ct. at 2770. Such speculative commentary on matters of public concern is critical to the "uninhibited, robust, and wide-open" public debate essential to a democratic society, *see New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964), because it constitutes "a means of

---

10. While the letter does not refer to Judge Keohane by name, the evidence at trial established that the letter was widely understood as referring to Judge Keohane and the Gallagher trial and that Campbell intended the letter to be so understood. As such, any defamatory meaning is properly regarded as a defamation of Judge Keohane. *See* Restatement (Second) of Torts § 564 (1977) ("A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer.").

11. We recognize, however, that the fact that Campbell did not use her real name on either of the letters to the editor may be some evidence that she wished to damage Judge Keohane while attempting to avoid culpability.

fueling a national discourse" and stimulates "public pressure for answers from those who know more." *Milkovich,* 497 U.S. at 35, 110 S.Ct. at 2714 (Brennan, J., dissenting).

Campbell expressed her views by using capital letters and multiple exclamation points ("HOW SICK!!!!!"); gross overgeneralization ("The 'upper crust' ... will do anything for money"); and such colorful and exaggerated terms as "sickie," "terrorists," "sleaze," and "scum." The overall tone of the letter indicates that Campbell is venting her anger and frustration and is a signal that her words should not be taken literally or as reasoned accusations.

Moreover, considering the letter in the wider social context in which it appeared, a reasonable reader could not have taken Campbell's letter as actual assertions of fact, but would regard her statements as one citizen's suspicions and conjecture concerning well-publicized public events. As the court of appeals recognized, the readers of the *Fremont Observer* were familiar with the circumstances surrounding the Gallagher trial as well as other recent scandals concerning doctors and public officials.[12] *Keohane,* 859 P.2d at 299–300. In addition, the verdict in the Gallagher trial and the outcome of Judge Keohane's retention election were widely known public facts. Given this context, we hold that a reasonable reader of the Sick Pillars letter would have understood it as Campbell's expression of anger and frustration with the medical and legal community of Fremont County and her own conjectural explanation for the cause of that anger and frustration.

The letter appeared in the editorial section of the paper, a traditional forum for debate, where intemperate and highly biased opinions are frequently presented and, absent credentials which make the author particularly credible, often times should not be taken at face value. *See Ollman,* 750 F.2d at 986; *Reddick v. Craig,* 719 P.2d 340, 345 (Colo.App.1985).

Finally, we agree with the court of appeals that "to a reasonable reader, Campbell's statements would be received as Campbell's personal appraisal of generally known facts and not as an assertion of any firsthand knowledge otherwise unavailable to the audience." *Keohane,* 859 P.2d at 300 (citing *Burns,* 659 P.2d at 1360, and *Dunlap v. Wayne,* 105 Wash.2d 529, 716 P.2d 842, 849 (1986)). There is nothing about Campbell individually, nor any suggestion in the Sick Pillars letter, that suggests knowledge of facts concerning Judge Keohane that were not generally known.

Thus, we hold that the Sick Pillars letter "cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich,* 497 U.S. at 20, 110 S.Ct. at 2706. Accordingly, we conclude that the court of appeals properly held that the letter is constitutionally privileged and not actionable.

**B**

■ Campbell's second letter was printed under the headline "White Collar Crime, Gold Rush of the '80's." The letter begins: "A trial to the court which means no jury, is used and only a judge renders a decision seems to be open to suspect. At least where 'white collar crime' is concerned." Campbell then proposed a hypothetical situation detailing how a "judge is really in a position to clean up financially," if, "as an example," the judge approaches "an old buddy" who is suspected of a crime and stands to lose his license to practice medicine or law and offers to "find a way out" in exchange for a "home in another state" and some "six figure money." The letter continues that "[i]f this could be proven, it is ... called extortion. Using your position, elected or appointed, to line your own pockets is despicable at best and a criminal act at worst." Campbell closed the letter as follows: "If you have an expensive lifestyle or an expensive drug habit, I guess this is the best you can do."

---

**12.** Throughout the 1980's, Cañon City and Fremont County in general were rife with allegations of corruption and misconduct in the legal and medical professions. A district attorney for the 11th Judicial District, which encompasses Cañon City and Fremont County, was arrested for distribution of a controlled substance, and an assistant district attorney resigned while being investigated for the same conduct. In addition, it was reported that two Cañon City doctors engaged in an improper medical procedure.

As in the case of the first letter, we agree with the court of appeals that the White Collar Crime letter contains verifiable facts or implications about Judge Keohane. *See supra* note 10. The letter states that a judge, in agreeing to find "a way out of [a defendant's] dilemma," is in a position to "really clean up financially" if the judge agrees to accept money and a new home out of state in exchange for leniency. "[T]he factual similarities between the Gallagher trial and the 'hypothetical' situation set forth in the letter implies that the judge in that case accepted a bribe." *Keohane,* 859 P.2d at 300. Whether or not Judge Keohane accepted a bribe in the Gallagher trial is a fact susceptible to verification.

Again, however, we are of the opinion that the statements, when considered in the context in which they appeared in the letter as well as the broader social context of their utterance, could not reasonably be interpreted as stating actual facts about Judge Keohane. First, the letter is replete with speculative and conjectural language, i.e., "A decision *seems* to be suspect"; "*Say* you have an old buddy"; "He *can* approach his old buddy"; "He *can* say you know Dr. So and So"; "If this *could* be proven." (emphasis added). This conjectural and speculative language alerts the reasonable reader that Campbell is offering nothing more than an elaborate hypothetical scenario as a possible explanation of the verdict in the Gallagher trial. *See Burns,* 659 P.2d at 1360 (language such as "in my opinion, while not determinative, may provide the reasonable listener with grounds to discount that which follows").

Moreover, given the well-publicized allegations of corruption against the medical and legal professions in Fremont County, a reasonable reader would realize that Campbell was offering a purely speculative leap from generally known facts to the realm of hypothetical explanation. The letter's placement in the editorial section of the paper also serves to put readers on notice that the assertions should be carefully scrutinized before being accepted as actual facts. Finally, nothing about Campbell nor her statements in the White Collar Crime letter indicates that her speculations were based on anything

other than generally known facts about the Gallagher trial and the legal and medical professions of Fremont County in general.

Thus, we agree with the court of appeals that the content, tone, and context of the White Collar Crime letter establish that a reasonable person would not construe the letter as asserting actual facts. Instead, the letter was only an expression of Campbell's own hypothetical explanation for the verdict in the Gallagher trial. It is, therefore, constitutionally protected.

### IV

The respondents assert that Stewart's remarks were also entitled to constitutional protection and that the damages awarded by the trial judge were improper. We disagree.

### A

After the trial in which Dr. Gallagher was found not guilty by reason of impaired mental condition, Stewart uttered to Jurgens the remarks which ultimately led to the defamation action. The exchange between Stewart and Jurgens went as follows:

Stewart: What do you think, was he paid in drugs or money?

Jurgens: What?

Stewart: Do you think he was paid off in cash or cocaine?

Jurgens: Steve, you are a real piece of work.

Stewart's comments are capable of being proven true or false and therefore the first prong of the constitutional analysis indicates the statements may not be protected speech. The implication underlying the questions is clear: Stewart was asserting that Judge Keohane took a bribe.

A question, like a statement of belief or opinion, though not phrased in the form of a declaration of fact, may imply the existence of a false and defamatory fact. "[T]he issue of falsity relates to the defamatory facts implied by the statement." *Milkovich,* 497 U.S. at 20, 110 S.Ct. at 2706. Stewart specifically asked Jurgens *what kind of bribe* Judge Keohane took, and not *if* Judge Keohane had accepted a bribe. Stewart asked if Judge

Keohane took "money *or* drugs" and "cash *or* cocaine." Stewart did not merely wish to inquire about Jurgens' thoughts concerning whether Judge Keohane had accepted a bribe; Stewart's questions implied that Judge Keohane had accepted a bribe and the only unresolved issue was how Judge Keohane had been paid.[13] Therefore, the implied statement underlying Stewart's question is "sufficiently factual to be susceptible of being proved true or false." *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707.

Even if the statement is capable of being proved true or false, the statement must also lead a reasonable person to conclude that the speaker was communicating an actual fact. *Burns,* 659 P.2d at 1360. Under the facts of this case, a reasonable person would have concluded that Stewart was asserting an actual fact.

In this case, the phrasing of the assertion indicates that Stewart was stating a fact.[14] Stewart did not phrase the question in a manner suggesting that it was merely opinion or in such a way as to reasonably imply that the question of whether Judge Keohane took a bribe was still open to dispute. The common meaning of the words utilized by Stewart conveys that Judge Keohane took some type of bribe and Stewart wanted to know how he was paid. *Id.* at 1357 ("A finding that the language was used was defamatory must be predicated on ... the common meaning of the words utilized."); *see also Milkovich,* 497 U.S. at 18, 110 S.Ct. at 2705–06 ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."). Additionally, the questions are not phrased in such a manner to indicate that they are merely rhetorical hyperbole. *See Milkovich,* 497 U.S. at 16–17, 110 S.Ct. at 2704–05; *Falwell,* 485 U.S. at 50, 108 S.Ct. at 879; *Bresler,* 398 U.S. at 13–14, 90 S.Ct. at 1541–42; *Letter Carriers,* 418 U.S. at 284–86, 94 S.Ct. at 2781–82.

Second, the context of the statement also indicates that Stewart's questions implied fact. A reasonable person could have believed that as a councilman, Stewart could have been basing his implied assertion on facts that Stewart did not disclose in the offending question. *See Burns,* 659 P.2d at 1360 (noting that reasonable people could believe that a reporter was privy to inside knowledge of the undisclosed facts that supported the defamatory statement). When a city councilman speaks with a reporter, a reasonable person could believe that the question is based on defamatory facts "which the reporter has not disclosed to the audience but which the audience can reasonably expect to exist." *Burns,* 659 P.2d at 1358; *see also Hotchner v. Castillo–Puche,* 551 F.2d 910, 913 (2d Cir.) ("Liability for libel may attach, however, when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader."), *cert. denied sub nom. Hotchner v. Doubleday & Co.,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). Stewart's assertion that he was merely questioning whether Judge Keohane took a bribe is belied by his prior statement that Judge Keohane was "the best judge money can buy." Thus, placing Stewart's question in context indicates that Stewart implied that he knew the fact underlying the question, i.e., that Judge Keohane was "paid off."

Finally, the circumstances surrounding Stewart's questions to Jurgens imply that a reasonable person would find that Stewart was stating an actual fact. The numerous culpable acts committed by professionals in Cañon City before, during, and after the Gallagher trial indicates that reasonable people could be aware of official misconduct and would believe that Stewart was saying that Judge Keohane was just another culpable

---

13. The question posed by Stewart is analogous to the question: "Is John Jones a liar or a cheat?" Whether Jones is a liar or a cheat is not material to the underlying implication that Jones is dishonest.

14. We note that in determining whether Judge Keohane was defamed, the critical inquiry is not the meaning Jurgens gave to the questions. The statement is defamatory if Judge Keohane is prejudiced in the eyes of a substantial and respectable minority of the community. *Burns,* 659 P.2d at 1357.

official taking bribes. Additionally, Stewart made his remarks to a reporter who had previously published the prior statement, "That's the best judge money can buy." This indicates that a reasonable person would be aware of the accusation of bribery underlying the defamatory questions. Most importantly, the question under these circumstances implied a criminal action and we have approved of a holding that "accusations of criminal activity, 'even in the form of opinion, are not constitutionally protected.' " *Burns,* 659 P.2d at 1359 (quoting *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1307, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977)). Many other courts have also held that allegations of illicit behavior, even if they are expressed as opinion, may support a defamation action if there is no adequate exposition of the underlying facts that support the allegedly defamatory statement. *See Burns,* 659 P.2d at 1359 (collecting cases).

▮▮▮ The second inquiry—whether reasonable people would conclude that the assertion is one of fact—and the factors that weigh on that determination require application of an objective standard to the statement and circumstances surrounding the statement. The trial judge determined that these remarks were actionable and we should not substitute our interpretation of the evidence absent an erroneous determination.[15]

Therefore, Stewart's questions implied an assertion susceptible of being proved true or false and a reasonable person would have understood Stewart's questions as actually implying that Judge Keohane had accepted a bribe. Accordingly, we affirm the court of appeals.

### B

▮▮▮ Because we hold that Judge Keohane has an actionable slander claim, and because we did not grant certiorari to review whether Stewart's remarks constituted slander per se, we must now turn to the issue of damages. The court of appeals held that Judge Keohane's proof of emotional damage was "sufficient to permit the jury to conclude that he suffered actual damage." *Keohane,* 859 P.2d at 302. We agree.

▮▮▮ A public figure asserting a claim for slander per se must establish actual damages. *Rowe v. Metz,* 195 Colo. 424, 425–26, 579 P.2d 83, 84 (1978). Actual damages are inherently difficult to prove and may be established by proving harm to reputation, personal humiliation, mental anguish, or physical suffering. *Bolduc v. Bailey,* 586 F.Supp. 896, 901 (D.Colo.1984). Because the damage issue does not affect significant constitutional interests, it is the prerogative of the individual states to decide what type of damages, including emotional harm alone, may be compensable in a defamation action.[16] *Time,*

---

**15.** Although the determination of whether the statement is constitutionally protected is a matter of law, *Milkovich,* 497 U.S. at 17, 110 S.Ct. at 2704–05; *Bose Corp.,* 466 U.S. at 499, 104 S.Ct. at 1958–59; *Kuhn,* 637 P.2d at 318; *Sall v. Barber,* 782 P.2d 1216 (Colo.App.1989), we believe that the inquiry of how the statement was said, including the inflection of the speaker's voice, is a matter of fact best left to the trial judge to determine. Stewart's questions, however, do not reveal the inflection with which they were spoken. Given this limitation, and recognizing that the reasonable understanding of the remarks turns in part on that inflection, we are hesitant to completely ignore the ruling of the trial judge.

**16.** We recognize that several state courts have decided not to allow a plaintiff to recover damages for emotional harm in the absence of reputational damage. *See Little Rock Newspapers, Inc. v. Dodrill,* 281 Ark. 25, 660 S.W.2d 933, 935 (1983) ("An action for defamation has always

required [the] concept of reputational injury and recovery for mental suffering alone has not been allowed.); *Gobin v. Globe Publishing Co.,* 232 Kan. 1, 649 P.2d 1239, 1243 (1982) (stating that damage to reputation must be shown and additional damages are "parasitic"); *France v. St. Clare's Hospital & Health Ctr.,* 82 A.D.2d 1, 441 N.Y.S.2d 79, 82 (N.Y.App.Div.1981) ("Absent proof of harm to his reputation, a plaintiff not may not recover on a claim of defamation...."). We do not take this route, however, because emotional damages are merely one injury of many that may be proved to show actual damages. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz,* 418 U.S. at 323, 94 S.Ct. at 2997–99; *Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450, *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *see also CJI-Civ.3d* § 22.12 (1989). Additionally, we note that damages are already extremely difficult to prove and to measure, and that restricting types of proof would only increase the difficult standard.

*Inc. v. Firestone,* 424 U.S. 448, 460, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976).

■ In this case, the evidence in the record consisted of evidence of Judge Keohane's emotional distress upon hearing Stewart's remarks from Jurgens. Although Jurgens testified that he did not understand Stewart's remarks as defamatory, nor did he tell them to anyone but Judge Keohane, neither fact is dispositive of the damage issue. *See Burns,* 659 P.2d at 1357 (noting that a communication needs only to tend to prejudice the plaintiff in the eyes of a substantial and respectable minority); *Bolduc,* 586 F.Supp. at 901 (the number of persons who hear the statement is relevant of the amount of and not the fact of damages). Here, Judge Keohane testified that he was "devastated" by the *Daily Record* article that stated Judge Keohane was "the best judge money can buy." The remarks that are the subject of this defamation action against Stewart, i.e., the query whether Keohane was bought off in money or drugs, caused Judge Keohane to feel worse.

■ Claims for damages for emotional distress are inherently difficult to prove with certainty, to rebut, and to evaluate. *Rowe,* 195 Colo. 424, 425–26, 579 P.2d 83, 84 (1978). As a result, the determination by the jury of both the existence and value, if any, of the damage should be given considerable discretion and should not be overturned unless the jury's award is grossly and manifestly excessive. *See Dixson v. Newsweek, Inc.,* 562 F.2d 626, 631 (10th Cir.1977) (stating that under Colorado law, the standard of review in libel actions is the same as in other cases); *Bohlender v. Oster,* 165 Colo. 164, 168, 439 P.2d 999, 1003 (1968) (holding that a jury award of damages will not be disturbed on review unless the amount of the award is grossly and manifestly inadequate or excessive). We hold that the evidence in the record is sufficient for the jury to have concluded that Judge Keohane suffered actual damages and we do not believe the award is grossly and manifestly excessive.

## V

For the foregoing reasons, we affirm the court of appeals holding that Campbell's letters to the editor are not actionable and that Stewart's questions to Jurgens are actionable. We also affirm the court of appeals decision to uphold the damage award based on Stewart's questions.

ROVIRA, C.J., concurs in part and dissents in part, and LOHR and MULLARKEY, JJ., join in the concurrence and dissent.

ROVIRA, Chief Justice, concurring in part and dissenting in part.

The majority concludes that the two letters written by Campbell are constitutionally privileged and thus, not actionable in a suit for defamation. I agree with that conclusion. I disagree, however, with the majority's holding that Stewart's statements to Jurgens imply a verifiable assertion of fact and could reasonably be understood as an assertion of actual fact. Accordingly, I dissent to Part IV(A) of the majority opinion. Though I think it is unnecessary to reach the question, I also disagree with the majority's holding in Part IV(B) that Keohane presented sufficient evidence to support the jury's award of damages against Stewart. Accordingly, I concur in part and dissent in part.

## I

Throughout the 1980's, Cañon City and Fremont County in general were rife with allegations of corruption and misconduct in the legal and medical professions. A district attorney for the 11th Judicial District, which encompasses Cañon City and Fremont County, was arrested for distribution of a controlled substance, and an assistant district attorney resigned while being investigated for the same conduct. In addition, it was reported that two Cañon City doctors engaged in an improper medical procedure.

Subsequently, Dr. Gallagher, an anesthesiologist at St. Thomas More Hospital, was charged with sexually assaulting an anesthetized teenage patient. Articles published in a newspaper, the *Cañon City Daily Record,* indicated there was evidence that Gallagher

had sexually assaulted his patient.[1]

After criminal charges were filed against Gallagher, the case was assigned to Keohane, who was then serving as a district court judge in the 11th Judicial District. Gallagher opted that his trial be to the court. Although Keohane had represented St. Thomas More Hospital from 1965–1980, he did not recuse himself. He did, however, disqualify a deputy district attorney whose wife was a hospital employee. After the prospect arose that Keohane might not be able to preside over the case due to an injury, Gallagher requested a continuance. Keohane was, however, able to preside over the case shortly after his surgery. The *Cañon City Daily Record* and other newspapers published these factual and procedural details regarding the Gallagher trial.

Gallagher was found not guilty by reason of impaired mental condition and was ordered to report to a state mental institution. No prison sentence was imposed. There was widespread outrage among the citizens of Cañon City concerning the verdict. A few days after the trial was completed, the citizens of the 11th Judicial District voted not to retain Keohane in office.

The specific conduct giving rise to this lawsuit against Stewart is as follows. During the Gallagher trial while Stephen Stewart, a Cañon City Councilman and spectator at the trial, was leaving the courtroom, Dwight Jurgens, a reporter for the *Cañon City Daily Record*, reportedly heard Stewart comment: "That's the best judge money can buy." While the trial was still in progress, Jurgens published an article about the trial which included Stewart's remark.

After the verdict in the Gallagher trial was announced, Stewart approached Jurgens and twice asked Jurgens if he thought Keohane had been "paid off" in drugs or money. These remarks were not published in the newspaper.

After the loss of his retention election, Keohane filed a defamation action against Stewart and others. His claim against Stewart for slander was based solely on the remarks made by Stewart to Jurgens after the verdict was announced. The trial court instructed the jury that Stewart's statements constituted slander per se. The jury awarded Keohane $15,000 in compensatory damages and $5,000 in punitive damages against Stewart. The award of punitive damages was subsequently reduced to $2,500 by the trial court.

On appeal, the court of appeals concluded that Stewart's remarks were not constitutionally protected because "a reasonable person could conclude that Stewart was implicitly asserting as actual fact that Keohane had accepted a bribe based upon undisclosed facts known to him as a city councilman." *Keohane*, 859 P.2d at 291. The court of appeals additionally held that the evidence was sufficient to permit the jury to conclude that Keohane suffered actual damages as a result of Stewart's comments to Jurgens.

## II

Stewart argues on cross-appeal that the court of appeals erred in concluding that his comments to Jurgens are not constitutionally protected. I agree. When considered in light of the relevant factors set forth in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) and *Burns v. McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983), Stewart's remarks cannot reasonably be understood as stating actual facts about Keohane. Thus, I would hold that they are constitutionally privileged and therefore not actionable in a defamation suit.

Keohane based his defamation suit against Stewart on the following exchange between Stewart and Jurgens:[2]

Stewart: What do you think, was he paid in drugs or money?

---

1. It was stated in the press that: Gallagher had destroyed his scrub suit before the crime was reported to the police; DNA testing revealed that the chances were one in 4.7 billion that someone other than Gallagher committed the assault; and Gallagher confided in another doctor and asked him not to reveal the crime.

2. This account of Stewart's remarks is taken from Jurgens' testimony on direct examination at trial. Stewart denied having made the comments.

Jurgens: What?

Stewart: Do you think he was paid off in cash or cocaine?

Jurgens: Steve, you are a real piece of work.

The court of appeals concluded that Stewart's comments were capable of being proved true or false. The court reached this conclusion on the grounds that:

The undisputable implication of Stewart's question—do you think he took drugs or money?—was that Keohane had been bribed. Stewart was not questioning whether Keohane had been bribed; he was merely asking how. Thus, the connotation that Keohane accepted a bribe of money or drugs is clear from Stewart's statements themselves, and such an allegation is capable of being proved true or false.

*Keohane,* 859 P.2d at 297. The majority reaches the same conclusion, with which I agree.

I disagree, however, with the majority's conclusion that Stewart's remarks could reasonably be understood as an assertion of actual fact.

Stewart made his comments to Jurgens shortly after the verdict in the Gallagher trial was rendered. As noted above, that verdict was unpopular and, as the evidence indicated, tended to verify the suspicions and derision felt by many in Fremont County regarding the legal and medical professions there. Thus, given the context of his statements, a reasonable listener could not understand the comments as assertions of actual fact about Keohane, but would recognize them as a figurative expression of Stewart's dissatisfaction with the verdict. As such, the statements are nothing more than a hyperbolic and figurative expression of Stewart's discontent and low regard for Keohane as a judge.

In this sense, Stewart's remarks are analogous to those at issue in *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). In *Bresler,* a real estate developer was negotiating with the city council for a zoning variance while at the same time negotiating with the city over other land that the city sought to purchase from him. A public meeting was held relating to the land purchase, and a local newspaper reported that a number of citizens characterized the developer's tactics and bargaining position as "blackmail." The developer sued for libel. The Court rejected the argument that the statements were actionable on the ground that given the context of the speech, i.e., that it was made in the course of a heated public debate, a reasonable person would have interpreted the word "blackmail" figuratively rather than as a literal accusation that the plaintiff had committed a crime: "[E]ven the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable." *Id.* at 14, 90 S.Ct. at 1542.

Likewise, in *National Association of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), the Court considered the context of a Jack London quote defining a "scab" as, among other things, a traitor. The Court noted that the definition was published in the course of a labor dispute before concluding that a reasonable person would not have interpreted the term "traitor" to mean that the subject of the statement had actually committed treason. Rather, the Court concluded that statement was not actionable in a suit for defamation because the term could not reasonably be construed as a representation of fact, but used only in its "loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization." *Id.* at 284, 94 S.Ct. at 2781.

In concluding that the language at issue in *Bresler* and *Letter Carriers* was not actionable, the Court relied heavily on the fact that the statements were figurative and hyperbolic given the context in which they arose. Similarly, the context of Stewart's comments would notify the reasonable listener that they were nothing more than "vigorous epithets," "rhetorical hyperbole," or "loose and figurative" expressions of the perceived injustice and unreasonableness of the verdict in the Gallagher trial. As such, they cannot rea-

sonably be understood as an assertion of actual fact.

Furthermore, the broader context of Stewart's remarks, coming shortly before Keohane was to face a retention election, supports the conclusion that they could not reasonably be construed as an assertion of actual fact. In the context of elections for public office, "hints of bribery, embezzlement, and other criminal conduct are not infrequent," and often times constitute nothing more than rhetorical hyperbole. *Carr v. Warden,* 159 Cal.App.3d 1166, 206 Cal.Rptr. 162, 164 (1984) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 273 n. 14, 84 S.Ct. 710, 722 n. 14, 11 L.Ed.2d 686 (1964)).[3]

It is also significant that nothing about Stewart's comments themselves suggest that they were based on facts not generally known. Stewart was a city councilman for Cañon City. The court of appeals observed that "[a]s such, a reasonable person might expect him to have knowledge of the affairs of local government unavailable to the general public." *Keohane,* 859 P.2d at 297. On the other hand, it would be reasonable to believe that Stewart was not privy to undisclosed information concerning state judicial officers. He was not, after all, a member of the police department investigating alleged criminal activity nor did he occupy a position responsible for overseeing the judicial officers of the 11th Judicial District. Thus, his position as a public servant is not particularly relevant with regard to whether a reasonable person could believe that he had knowledge of undisclosed information concerning Keohane, and nothing in the comments themselves suggest any awareness of such information.

The majority concludes that a reasonable person could have believed that as a councilman, Stewart's remarks were based on implied assertions of fact that were not disclosed in his comments. Remarkably, the majority reaches this conclusion on the grounds that "[w]hen a city councilman speaks with a reporter, a reasonable person

could believe that the question is based on defamatory facts 'which the reporter has not disclosed to the audience but which the audience can reasonably expect to exist.'" Maj. op. at 1303. The question here is not whether Jurgens, the reporter, had undisclosed information relating to Stewart's remarks. The question is whether Stewart's remarks themselves imply a factual predicate undisclosed by those remarks. That is to say, Jurgens' knowledge is entirely irrelevant to evaluating Stewart's comments. Moreover, Jurgens was the audience here, and there was no other audience which could reasonably have believed that Stewart's comments were based on undisclosed facts known to Jurgens.

Finally, the medium through which these comments were communicated must be taken into account, *Burns,* 659 P.2d at 1360, particularly because the spoken word may convey a different meaning than written words.

> Because a court must examine the entire context of a publication, the court should also consider dramatic intonations by the announcer in determining whether the broadcast conveys a defamatory meaning. Television [like all speech] touches more senses than does the print media, and the standard for finding defamation cannot be woodenly applied without taking into account the kind of medium by which the message was delivered.

*White v. Fraternal Order of Police,* 909 F.2d 512, 526 (D.C.Cir.1990) (citations omitted). For this reason, it is critical to recognize that the reasonableness of understanding these remarks as assertions of actual fact depends in part on the inflection with which they were uttered. For instance, if they were spoken with the inflection of a statement, it is easier to interpret them as an assertion of fact that Keohane had been bribed and raising the question only of the form of that bribe. If, however, Stewart made his remarks with the inflection of a question, the reasonable interpretation of the remarks is simply that of an

---

**3.** The majority states that because "Stewart made his remarks to a reporter who had previously published the prior statement, 'That's the best judge money can buy'," this fact "indicates that a reasonable person would be aware of the

accusations of bribery underlying the defamatory question." Maj. op. at 1304. I fail to see why the objective, reasonable person would necessarily be a reader of the *Cañon City Daily Record,* and would have read Jurgens' prior article.

inquiry regarding whether Jurgens thought Keohane had accepted either drugs or money in the Gallagher trial.

Of course, reading Stewart's remarks does not reveal the inflection with which they were spoken. Given this limitation, and recognizing that the reasonable understanding of the remarks turns in part on that inflection, we are faced with a difficult task. In light of this dilemma, it seems appropriate to consider Jurgens' interpretation of Stewart's comments, as he is the only person who actually heard them.[4] To the extent that his understanding of those remarks may reveal the inflection with which they were spoken, they are relevant in determining how a reasonable person would have understood them. *See* Restatement (Second) of Torts § 563, cmt. c (1977) ("It is not enough that the language is reasonably capable of a defamatory interpretation if the recipient did not in fact so understand it.").

Jurgens testified that he had not "the slightest clue" of what Stewart meant by his remarks. He further testified that he did not take the remarks seriously and stated that he "never knew" when Stewart was being serious or just saying something for

effect. In his sworn affidavit, Jurgens stated that after sharing Stewart's remarks with two other newspaper employees, "[t]he three of us just shook our heads at what we considered Councilman Stewart's foolish remarks...."[5] Thus, Jurgens, the only person who actually heard Stewart's remarks, did not understand what they meant, did not take them seriously, and regarded them as foolish.[6] In short, Jurgens did not understand the remarks as an assertion of actual fact about Keohane. In my judgment, this interpretation is relevant under the facts of this case in determining whether Stewart's comments reasonably could be understood as an assertion of actual fact. *See Sigmon v. Womack*, 158 Ga.App. 47, 279 S.E.2d 254, 257 (Ct.1981) (in order to effect the publication of a libel, there must be a reading of it and an understanding of its meaning by the person reading it).

The phrasing of Stewart's comments, when considered in context, as well as Jurgens' interpretation of those remarks, lead to the conclusion that they could not reasonably be understood as an assertion of actual fact—as a matter of law.[7] Accordingly, I conclude

---

**4.** In considering Jurgens' understanding of Stewart's remarks, I do not suggest that the subjective understanding of the recipient of an allegedly defamatory statement is dispositive as to that statement's reasonable meaning, nor do I imply that such a subjective understanding will always be relevant. Rather, I conclude simply that under the facts of this case, Jurgens' interpretation of the comments should be considered and, based on the other considerations detailed above, support the conclusion that Stewart's remarks cannot reasonably be understood as an assertion of actual fact about Keohane.

**5.** Oddly, the majority seeks to discount the significance of Jurgens' understanding of Stewart's remarks on the grounds that "in determining whether Judge Keohane was defamed, the critical inquiry is not the meaning Jurgens gave to the questions. The statement is defamatory if Judge Keohane is prejudiced in the eyes of a substantial and respectable minority of the community." *Maj. op.* at 1303 n. 14. Be that as it may, the question here is not whether Keohane has been defamed but rather, whether Stewart's comments are constitutionally privileged.

**6.** Jurgens' affidavit also states that he was unable to characterize the comments as being said in jest, in an accusatory manner, or in a conversational tone because he could never tell if Stewart

was saying something for effect or because he sincerely believed it.

**7.** The majority correctly states the law when it recognizes that "whether the statement is constitutionally protected is a [question] of law...." Maj. op. at 1304, n. 15 (citing *Milkovich*). Oddly, however, the majority also states that under the *Milkovich* test, we should not "substitute our interpretation of the evidence [for that of the trial court's] absent an erroneous determination." *Id.* Not surprisingly, the majority cites no authority for this latter conclusion.

Questions of law are reviewed *de novo* by this court, and no deference is owed to the trial court's "interpretation of the evidence." *See Bloomer v. Board of County Comm'rs*, 799 P.2d 942, 944 (Colo.1990), *rev'd on other grounds*, *Bertrand v. Board of County Comm'rs*, 872 P.2d 223 (Colo.1994) (appellate courts need not defer to trial courts when reviewing questions of law). Moreover, it simply does not make sense to say that we should not substitute our interpretation of the evidence for that of the trial court's unless the trial court's legal conclusion is wrong. The only way for a reviewing court to decide whether a trial court incorrectly determined whether a statement is constitutionally privileged is to examine the evidence and come to a conclusion based on that evidence.

that Stewart's remarks are constitutionally privileged.

## III

Though I do not think it necessary to decide whether sufficient evidence was presented on the question of damages to sustain the jury's award given that Stewart's comments are constitutionally privileged, I am compelled to state my disagreement with the majority's resolution of this issue.

Ironically, after emphasizing at length the need and importance of protecting the reputation of defamed persons—the *raison d'etre* of defamation law—the majority concludes that Keohane presented sufficient evidence to support the jury's award of damages in spite of the fact that absolutely no evidence was presented that Keohane's reputation had been harmed as a result of Stewart's comments to Jurgens. To the contrary, Jurgens, the only person who heard Stewart's comments, testified that they in no way changed his favorable opinion of Keohane.[8] The only evidence of damages presented by Keohane was that after learning of Stewart's remarks to Jurgens, he felt "worse" than he had before. In my opinion, this is insufficient as a matter of law to support an award of damages.

In *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the United States Supreme Court held that the decision of whether emotional harm alone is compensable in a defamation action is to be left to state law. This conclusion was premised on the recognition that defamation is a creature of state common law and, in light of other constitutional safeguards, restrictions on emotional damages were unnecessary to protect First Amendment liberties.

Since that decision, several states have refused to allow recovery for emotional harm in the absence of a showing of reputational damages. *See, e.g., Little Rock Newspapers, Inc. v. Dodrill*, 281 Ark. 25, 660 S.W.2d 933 (1983); *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 649 P.2d 1239 (1982); *France v. St.*

*Clare's Hospital and Health Center*, 82 A.D.2d 1, 441 N.Y.S.2d 79 (App.1981). In addition, a number of legal scholars have concluded that allowing damages for emotional harm alone poses a significant threat to free speech, particularly when permitted to function as the equivalent of presumed damages. *See, e.g.*, W.Page Keeton, *Prosser and Keeton on The Law of Torts* 844–45 (5th ed. 1984) ("The law of defamation has been developed primarily for the protection of the reputational interest. This being so, it would appear to be somewhat anomalous to permit a plaintiff to recover actual damages without [showing] actual harm to his reputation, based either on a presumption or proof of such harm."); Rodney A. Smolla, *The Law of Defamation* § 9.06 (1994); David A. Anderson, *Reputation, Compensation, and Proof*, 25 Wm. & Mary L.Rev. 747 (1984).

As the majority has recognized, damage to reputation is the essence of a defamation action. Maj. op. at pp. 1297–99. *See also Monitor Patriot Co. v. Roy*, 401 U.S. 265, 275, 91 S.Ct. 621, 627, 28 L.Ed.2d 35 (1971); *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219, 1233 (D.Colo. 1976). As such, courts have recognized that the harm that the defendant's speech has caused to the plaintiff's reputation is critical. *Bolduc v. Bailey*, 586 F.Supp. 896, 900–01 (D.Colo.1984) ("The gravamen of an action for defamation is the damage to one's reputation in the community. . . .") (quoting *Gobin*, 649 P.2d at 1243).

This is particularly true in an action involving a public official or speech concerning an issue of public concern. The Supreme Court has observed on several occasions that hurt feelings are an inevitable risk of public office and do not outweigh the compelling interest in free speech. As Justice Powell noted,

[a]n individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. . . . [T]hose classed as public figures have thrust themselves to the fore-

---

8. It goes without saying that the subsequent publication of those remarks resulting from Keohane bringing this lawsuit cannot form the basis for

concluding that Keohane's reputation has been damaged as a result of those statements.

front of particular public controversies in order to influence the resolution of the issues involved.... [T]hey invite attention and comment.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344–45, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). It is inevitable that such comments will not always be "reasoned or moderate; public figures as well as public officials will be subject to 'vehement, caustic and sometimes unpleasantly sharp attacks'." *Hustler Magazine v. Falwell,* 485 U.S. 46, 51, 108 S.Ct. 876, 880, 99 L.Ed.2d 41 (1988) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964)).

In my judgment, permitting public officials to recover damages solely for emotional distress in a defamation action will result in a chilling of speech and discouragement of public debate. Knowing that they can be sued for nothing more than hurting the feelings of public officials, citizens will be more likely to remain silent on issues of public interest. Such an outcome clearly is contrary to the value placed on vigorous political debate and the principles which the First Amendment is intended to further.

The majority, however, concludes that a showing of emotional harm is itself sufficient to support an award of damages in an action for defamation on the grounds that "[c]laims for damages for emotional distress are inherently difficult to prove with certainty, to rebut, and to evaluate." Maj. op. at 1305. In my opinion, the fact that proof of emotional distress is difficult lends no support for the rule adopted by the majority. This observation is irrelevant to the question of whether such a showing alone is sufficient to support an award of damages in a suit for defamation. The fact that such harm is difficult to rebut, however, supports my conclusion.

Shifting the focus of a defamation action from an objective assessment of reputational harm to a highly subjective inquiry into the plaintiff's emotional state poses a considerable risk that a claim which is, in truth, not worthy of compensation, will be compensated. Without having to prove harm to reputation, a plaintiff could prevail and be awarded significant damages based on nothing more than self-serving testimony of hurt feelings, personal humiliation, and mental anguish—particularly in light of the fact that such harm is, as the majority recognizes, so difficult to rebut. *See The Law of Defamation* at § 9.06[5][b].

The point clearly is illustrated by the facts of this case. Keohane was awarded $20,000 in damages against Stewart based on his testimony that Stewart's comments made him feel "worse" than he had before. How could such testimony be rebutted by defendant? To allow the jury verdict to stand on the basis of such vague, unsubstantiated, and self-serving testimony is contrary to the very reason for defamation law—the protection of reputational harm, and will encourage litigation intended to assuage "hurt feelings" at the expense of free speech liberties.[9]

---

9. One need not go so far as to imply that emotional harm is, in and of itself, not worthy of compensation in light of the risks it imposes on free speech liberties. To the contrary, the point is simply that suits seeking damages solely for emotional harm should not be brought as defamation actions but should be pursued as actions for the intentional or negligent infliction of emotional distress. *Prosser and Keeton on The Law of Torts* at 845.

Colorado law permits a plaintiff to recover for intentional infliction of emotional distress upon a showing (1) that the defendant engaged in "extreme and outrageous" conduct; (2) that the defendant intended to cause the plaintiff severe emotional distress (or acted with reckless disregard for the plaintiff's emotional state); and (3) the plaintiff did in fact incur severe emotional distress as a result of the defendant's conduct. *CJI—Civ.3d* 23:1 (1989). One reason for requir-

ing a plaintiff to show outrageous conduct and severe suffering is to eliminate trivial claims. *Prosser and Keeton on the Law of Torts* at 56. Likewise, a plaintiff may prevail in an action for negligent infliction of emotional distress only if the defendant placed the plaintiff in fear of his own safety, and the plaintiff suffered "physical consequences or long continued emotional disturbance" as a result. *CJI—Civ.3d* 9:3. These stringent requirements are imposed in recognition of the fact that claims for emotional distress are easy to claim but difficult to verify or rebut.

As such, a defamed plaintiff seeking compensation for emotional distress would not be rendered helpless as a result of the rule I espouse but rather, would be required to prove the elements of the actual tort alleged. To hold as the majority does not only imperils free speech, it converts the law of defamation into a weak-kneed surro-

I would hold that the requirement that a public official plaintiff in a defamation case show actual damages, *see* maj. op. at 1304, cannot be fulfilled by showing only emotional harm. Harm to reputation must be established. As commentators have pointed out, permitting plaintiffs to prove actual damages merely by testifying as to their emotional distress defeats the purpose of requiring a showing of actual harm:

> Because self-serving testimony of personal humiliation and mental anguish will almost always be available to the plaintiff (and in most cases, the testimony will be genuinely sincere) those states that permit emotional distress standing alone to support an award of actual damages for defamation are in truth virtually eliminating proof of "actual harm" as a meaningful barrier to a plaintiffs' recovery.

*The Law of Defamation* at § 9.06[5][b]. *See also* Prosser & Keeton at 844; *Time, Inc. v. Firestone,* 424 U.S. at 475 n. 3, 96 S.Ct. at 975 ("It seems clear that by allowing this type of recovery the State had subverted whatever protective influence the 'actual injury' stricture may possess") (Brennan, J., dissenting).

Permitting evidence of emotional harm alone to establish actual damages effectively eviscerates the actual damages requirement and in so doing, poses such a threat to First Amendment liberties that I cannot join in its adoption. Accordingly, I conclude that Keohane failed to present sufficient evidence to support the jury's award of damages.

I respectfully dissent.

I am authorized to say that Justice LOHR and Justice MULLARKEY join in this concurrence and dissent.

gate for claims of intentional or negligent infliction of emotional distress.