**Paul KEOHANE, Plaintiff–Appellee,**

v.

**Grover K. WILKERSON, Stephen Stewart, and Terri Campbell, Defendants–Appellants.**

**No. 91CA1840.**

Colorado Court of Appeals, Div. I.

April 8, 1993.

Rehearing Denied May 13, 1993.

Certiorari Granted Sept. 20, 1993.

Paul J. Keohane, pro se.

Holland & Hart, A. Bruce Jones, Stephanie D. Welsh, Denver, for defendants-appellants.

Opinion by Judge DAVIDSON.

In this action for defamation, defendants, Stephen Stewart, Terri Campbell, and Grover Wilkerson, appeal from a judgment entered upon a jury verdict in favor of plaintiff, Paul Keohane. We affirm in part and reverse in part.

At the time this action arose, Keohane was serving as a district court judge in Fremont County. In late October and early November of 1988, Keohane presided over a highly publicized trial to the court in which a local anesthesiologist accused of sexually assaulting a teenage patient was found not guilty by reason of impaired mental condition (the Gallagher trial).

Following the verdict in the Gallagher trial, defendant Stewart, a Canon City councilman and spectator at the trial, allegedly approached Dwight Jurgens, a reporter for the Canon City *Daily Record,* and asked, "What do you think, was he paid off with drugs or money?" and, "Do you think he was paid off in cash or cocaine?" These remarks were not republished, and Jurgens allegedly told no one else but plaintiff of this exchange.

On November 8, 1988, the day of Keohane's retention election, two letters written by defendant Campbell under assumed names were published in the *Fremont Observer,* a local weekly newspaper. Although neither letter referred to Keohane by name, both referred to collusion and pay-offs between judges and doctors.

Keohane was not retained in the November election, and subsequently, he filed this defamation action against thirteen named defendants, including Stewart, Campbell, and Wilkerson, the editor of the *Fremont Observer.*

Over the objections of Stewart and Wilkerson, venue was ordered changed to the El Paso County district court. At the conclusion of the trial, only the claims against Stewart, Campbell and Wilkerson were submitted to the jury. The court ruled that Stewart's statements to Jurgens constituted slander per se and instructed the jury accordingly. With respect to Campbell's letters, the court instructed the jury as to libel per quod. The jury then returned a verdict in favor of Keohane, awarding him $15,000 in compensatory damages and $5,000 in punitive damages against Stew-

art, $25,000 in compensatory damages and $1,000 in punitive damages against Campbell, and $25,000 in compensatory damages and $2,500 in punitive damages against Wilkerson. The award of punitive damages against Stewart was subsequently reduced to $2,500 by the trial court.

On appeal, defendants contend, among other things, that (1) neither Stewart's comments nor Campbell's letters could reasonably be interpreted as implying factual assertions; (2) the statements, when considered in context, are not defamatory; (3) Keohane presented insufficient proof of damages; and (4) the trial court erred in ordering venue changed to the El Paso County district court. We determine that Campbell's letters to the editor were constitutionally protected speech and thus are not actionable. Otherwise, we affirm.

## I.

In *Living Will Center v. NBC Subsidiary (KCNC–TV), Inc.*, 857 P.2d 514 (Colo. App.1993), we addressed the issue of the actionability of statements for the first time since the U.S. Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). However, our opinion in that case was limited to the issue of whether the substance or gist of a television broadcast contained or implied assertions capable of being proved false. Because defendants raise additional issues which we have not yet fully considered in the wake of *Milkovich*, we must first address the proper standards for determining when a claim for defamation is actionable.

█ Whether allegedly defamatory language is constitutionally protected is a matter of law for the court to determine. *See Sall v. Barber*, 782 P.2d 1216 (Colo. App.1989). In order to make sure that the trial court's judgment does not constitute a forbidden intrusion on the field of free expression, a reviewing court must make an independent examination of the entire record. *Milkovich v. Lorain Journal Co., supra; see Living Will Center v. NBC Subsidiary (KCNC–TV), Inc., supra.*

Prior to *Milkovich*, statements of "pure" opinion were recognized as having constitutional privilege, and thus were not actionable for defamation in Colorado. *See Burns v. McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983); *Bucher v. Roberts*, 198 Colo. 1, 595 P.2d 239 (1979). This privilege was premised on dictum in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974), in which the court stated:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

However, not all statements of opinion enjoyed constitutional privilege. As the *Burns* court noted, "opinions may lose their constitutional protection when 'the average reader or listener or viewer perceives the comment as essentially an assertion of fact.'" *Burns v. McGraw–Hill Broadcasting Co., supra*, at 1360.

Accordingly, in considering if the statement was actionable, our supreme court adopted a three-part analysis to determine whether the statement constituted "pure" opinion or a factual assertion: first, the court examined the phrasing of the statement to determine whether it would reasonably be interpreted as rhetorical hyperbole rather than fact; second, the court examined the effect of the entire statement, not just the objectionable word or phrase, in context; and third, the court considered the circumstances surrounding the statement, including the medium through which it was disseminated and the audience to whom it was directed. *See Burns v. McGraw–Hill Broadcasting Co., supra; see also Sall v. Barber, supra.*

However, in *Milkovich*, the Supreme Court rejected the constitutional distinction between opinion and fact. In that case, Milkovich, then a high school wrestling coach, had testified at a hearing concerning an altercation that broke out at a high school wrestling meet in which several peo-

ple were injured. Following the hearing, an article appeared in the local newspaper criticizing the conduct of the coach and stating that: "Anyone who attended the meet or [an] impartial observer, knows in his heart that [Milkovich] lied at the hearing after [having] given his solemn oath to tell the truth." Subsequently, Milkovich commenced a defamation action against the newspaper, alleging that the article accused him of perjury and thereby damaged his reputation.

Noting that statements of opinion may nevertheless imply a false assertion of fact and that, in such cases, expressions of opinion can cause as much damage to reputation as an outright assertion of fact, the court refused to recognize the dichotomy between "fact" versus "opinion" that emerged from *Gertz.* The court flatly rejected the existence of any "so-called opinion privilege *wholly in addition* to the protections we have already found to be guaranteed by the First Amendment." (emphasis in original) *Milkovich v. Lorain Journal Co., supra,* 497 U.S. at 24, 110 S.Ct. at 2708, 111 L.Ed.2d at 21.

However, the court reasoned that in order to ensure "uninhibited, robust, and wide-open" debate on matters of public concern, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation," or which "cannot 'reasonably [be] interpreted as stating actual facts' about an individual," continues to receive full constitutional protection. *Milkovich v. Lorain Journal Co., supra,* 497 U.S. at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 18–19 (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) and *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)). Finding that "the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false," and that the language and tenor of the newspaper column did not "negate the impression that the writer was seriously maintaining petitioner committed the crime of perjury," *Milkovich v. Lorain Journal Co., supra,* 497 U.S. at

21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19, the Supreme Court reversed the opinion of the Ohio Supreme Court which had dismissed the appeal on the grounds that the alleged defamatory statement was opinion and, therefore, not actionable.

■ Thus, after *Milkovich,* whether a statement is characterized as a "fact" or "opinion" is no longer a relevant inquiry in determining whether it may be constitutionally privileged. Rather, the relevant inquiry is whether the statement could be reasonably understood as declaring or implying a provable assertion of fact. *See Milkovich v. Lorain Journal Co., supra.*

Hence, in considering whether a particular statement is actionable as libel or slander, we must first determine whether a reasonable factfinder could conclude that a statement contains or implies an assertion susceptible of being proved false. *See Milkovich v. Lorain Journal Co., supra; see also Living Will Center v. NBC Subsidiary (KCNC–TV), Inc., supra.* This necessarily requires us to make two separate inquiries: (1) does the statement contain or imply a verifiable fact about the plaintiff, and (2) is the statement reasonably susceptible to being understood as an actual assertion of fact.

■ In making these inquiries, we are not limited to the literal meaning of the words contained in the statement. Although *Milkovich* eschews fact/opinion terminology, it does not require us to abandon the multi-factored analysis previously employed to determine the actionability of a statement. *See Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724 (1st Cir.1992). The factors identified by the *Burns* court, i.e., the phrasing of the statement, the context in which it appears, and the surrounding circumstances of its publication, are relevant and must be considered in determining whether the statement could reasonably be understood as containing an express or implied assertion of fact. *See Sunshine Sportswear & Electronics, Inc. v. WSOC Television, Inc.,* 738 F.Supp. 1499 (D.S.C.1989). In addition, we must consider the impression created by the words as well as the general tenor of the

conversation or article from the point of view of the reasonable person. *See Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991).

If, in light of these factors, a statement does not contain or imply a verifiable fact, it is not actionable. Likewise, if the statement does contain or imply a verifiable fact, but is not reasonably susceptible to interpretation as a declaration of fact, it will receive full constitutional protection and no action for defamation will lie. Conversely, a statement, even if it is phrased as an opinion, will not enjoy constitutional protection if the court concludes that its substance or gist could reasonably be interpreted as declaring or implying an assertion of fact. *See Milkovich v. Lorain Journal Co., supra.*

■ If the court determines that the statement is actionable, the claim may then be submitted to the factfinder for a determination of whether the statement is defamatory. *See Living Will Center v. NBC Subsidiary, (KCNC–TV), Inc., supra* (whether a statement makes a factual allegation and whether the statement is defamatory are separate and distinct issues).

Bearing these principles in mind, we address the specific issues raised by defendants in this appeal.

## II.

Defendants first contend that their statements are constitutionally protected under the First Amendment and therefore are not actionable. Thus, they argue, the trial court erred in submitting Keohane's defamation claim to the jury. We do not agree that Stewart's statements were privileged. However, we do conclude that Campbell's letters are constitutionally protected speech and, therefore, are not actionable.

## A.

Initially, we disagree with defendants' contention that Stewart's statements to Jurgens were ambiguous, open-ended questions which cannot be proven false and which were not asserted as fact.

■ We have little trouble concluding that Stewart's statements were capable of being proven true or false. The undisputable implication of Stewart's question—do you think he took drugs or money?—was that Keohane had been bribed. Stewart was not questioning whether Keohane had been bribed; he was merely asking how. Thus, the connotation that Keohane accepted a bribe of money or drugs is clear from Stewart's statements themselves, and such an allegation is capable of being proved true or false.

■ Contrary to defendant's suggestion, the phrasing of a statement as a "hypothetical" question does not necessarily clothe it in constitutional privilege. A question, like a statement of belief or opinion, although not phrased as an actual declaration of fact about an individual, may be actionable if it implies the existence of a false and defamatory fact. "[T]he issue of falsity relates to the defamatory facts implied by a statement." (emphasis deleted) *Milkovich v. Lorain Journal Co., supra,* 497 U.S. at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. Thus, if a "hypothetical" question reasonably implies a defamatory factual assertion, it may be actionable.

■ In addition, we are persuaded that, viewing the statement in context, a reasonable person could conclude that Stewart was asserting, as actual fact, that Keohane had accepted a bribe. *See Milkovich v. Lorain Journal Co., supra,* 497 U.S. at 18, 110 S.Ct. at 2705–2706, 111 L.Ed.2d at 17–18 ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.").

The record shows that Stewart was an elected official who occupied a position of trust in the Canon City area. As such, a reasonable person might expect him to have knowledge of the affairs of local government unavailable to the general public. Moreover, Stewart had publicly stated that Keohane was "the best judge money can buy" following an exchange with him during the Gallagher trial. This earlier comment, prior to the verdict in the Gallagher

trial, would tend to reinforce the view that Stewart was seriously maintaining that Keohane had accepted a bribe, rather than merely positing a speculative explanation for the verdict.

Thus, viewing Stewart's statements in context, we are persuaded that a reasonable person could conclude that Stewart was implicitly asserting as actual fact that Keohane had accepted a bribe based upon undisclosed facts known to him as a city councilman. *See Milkovich v. Lorain Journal Co., supra* (newspaper column was written so as to imply that reporter's presence at certain events made him uniquely situated to draw the inference that the plaintiff had lied); *Burns v. McGraw–Hill Broadcasting Co., supra,* 659 P.2d at 1360 ("[R]easonable people could have believed that the reporter had inside knowledge of the facts which would support her charge that [plaintiff] 'deserted' [her husband].").

■ Although Jurgens, the only party who heard Stewart make the comments, testified that he was unsure whether Stewart thought that Keohane had accepted a bribe, such testimony is not dispositive. Rather, we must determine whether a reasonable person could conclude that the speaker was seriously maintaining a factual assertion. Because we conclude that a reasonable person could, the trial court did not err in submitting the issue to the jury.

### B.

Next, defendants contend that Campbell's letters were not actionable for defamation because they contain no statements or implications reasonably susceptible to interpretation as assertions of fact. The letters, they argue, were "phrased in terms of apparency," indicating that Campbell was simply "speculating" as to misconduct by Keohane. When considered in context, they contend, the letters are properly seen as " 'loose, figurative, and hyperbolic' expressions of [Campbell's] disgust for the way prominent figures in the community had behaved." Finally, they emphasize that the letters appeared in the "letters to the editor" section of the *Fremont Observ-*

*er* in the context of a retention election. Thus, they argue, the trial court erred in determining that the letters were actionable. We agree.

■ Although both letters were published in the same edition of the newspaper, they appeared on different pages, under different headlines, and under different pen names. Therefore, each letter constitutes a separate statement and must be considered independently. *See Spears Free Clinic & Hospital for Poor Children v. Maier,* 128 Colo. 263, 261 P.2d 489 (1953).

### 1. The "Sick Pillars" Letter

The first of Campbell's letters, entitled *Sick Pillars of the Community,* appeared on page 12 of the November 8, 1988, edition of the *Fremont Observer.* The letter opens with a reference to the Gallagher trial and the trial of another local figure, stating: "The two local 'sickies' in our community that [sic] got caught have not and may never lose their licenses to practice medicine." The letter then goes on to state:

It's bad enough for these criminal acts to have occurred, but for his fellow appointed "pillar" to let him off with nothing as punishment, [sic] makes you wonder who is the sickest!

. . . .

Does anyone seriously think there was anything besides a conspiracy between the 3 Psychiatrists which [sic] are fellow doctors, the officer of the court and defense, to do anything but let this man off?

. . . .

We've all heard of the rackets that are pulled in courtrooms and all the payoffs, but does it have to be so obvious? The "upper crust", it appears will do anything for money.

. . . .

Why did the prosecutors in Dr. Gallagher's case not demand a jury trial? Tri-

al to the Court always means the judge has total control of the verdict. Under these circumstances did anyone expect that a guilty verdict would not be rendered?

■ Here again, we conclude that this letter contains several statements or implications of verifiable fact about Keohane. For example, on its face, the letter states that a conspiracy to "let off" the defendant existed in the Gallagher trial and that the motive for the conspiracy was money. In addition, the letter implies that Keohane was involved in this conspiracy. Each of these statements or implications is capable of being proved true or false.

However, viewing the letter in context, we conclude that it is not reasonably susceptible to an interpretation that it is maintaining factual assertions; rather, the letter can only be reasonably interpreted as suggesting a personal conclusion based upon facts which were accessible and well known to the community at the time of publication. Therefore, we conclude that it is not actionable.

■ When a party makes a speculative or conjectural statement based upon truthful, nondefamatory facts which are disclosed or otherwise generally known to the audience, the statement cannot reasonably be understood as an assertion of fact. *See Dunlap v. Wayne*, 105 Wash.2d 529, 716 P.2d 842 (1986); *see also Milkovich v. Lorain Journal Co., supra; Burns v. McGraw–Hill Broadcasting Co., supra; Seible v. Denver Post Corp.*, 782 P.2d 805 (Colo.App.1989); *Brooks v. Paige*, 773 P.2d 1098 (Colo.App.1988); Restatement (Second) of Torts § 566, comment c (1977).

In such a case, the author or speaker does not implicitly assert any firsthand knowledge inaccessible to the audience. To the contrary, if the audience is appraised of the facts underlying a speculative assertion, it is not required to share in the conclusion of the author and may judge the truth of the statement or draw conclusions for itself. *See Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280 (4th Cir.1987); *National Ass'n of Government Employees, Inc. v. Central Broadcasting Corp.*, 379 Mass. 220, 396 N.E.2d 996 (1979); *Dunlap v. Wayne, supra.*

Such speculative commentary on matters of public concern is critical to the "uninhibited, robust, and wide-open" public debate essential to a democratic society, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964), as it provides "a means of fueling a national discourse" and stimulates "public pressure for answers from those who know more." *Milkovich v. Lorain Journal Co., supra*, 497 U.S. at 35, 110 S.Ct. at 2714, 111 L.Ed.2d at 28 (Brennan, J., dissenting).

Here, prior to the Gallagher trial, another prominent doctor practicing in Canon City had been accused of sexual misconduct and had left the community. In addition, two local district attorneys, including one who had originally been assigned to the Gallagher case, had been accused of drug-related offenses, prompting the Canon City police chief to call publicly for a grand jury investigation into "the accusations, insinuations and rumors which have been leveled regarding public officials and law enforcement in the past year." Each of these events had received a great deal of publicity in the community.

In addition, the Gallagher trial, which involved a sexual assault by a doctor against his teenage patient, was highly controversial and had also received a great deal of publicity. Thus, it was well known that, following a trial to the court, in which three psychiatrists had testified as to his impaired mental condition, Gallagher was found not guilty by reason of mental impairment, and that, although Gallagher was ordered confined to a mental institution, he received no prison sentence.

In her letter, Campbell explicitly refers to the Gallagher trial, and there is ample evidence in the record to indicate that the letter was understood as referring to Keohane and the allegations surrounding other figures in the community. Such references to well-known events would put a reasonable reader on notice that Campbell based her allegations on facts which were gener-

ally known and available to the community. Thus, to a reasonable reader, Campbell's statements would be perceived as Campbell's personal appraisal of generally known facts and not as an assertion of any firsthand knowledge otherwise unavailable to the audience. *See Burns v. McGraw–Hill Broadcasting Co., supra; see also Dunlap v. Wayne, supra,* 105 Wash.2d at 540, 716 P.2d at 849 ("When a publisher makes a qualified or unqualified assertion of fact based upon true information supplied to the public or equally available to the public, he simply deduces a particular fact about the defamed person from known facts."). Because the factual premises for Campbell's conclusions generally were known, and because the letter contained no implied assertion of firsthand knowledge unknown to the audience, the audience remained free to judge the reasonableness, or lack thereof, of Campbell's conclusions, or to draw their own conclusions.

Moreover, the metaphoric choice of words and vituperative tenor of the letter, together with the placement of the letter, along with others by various authors, in the "letters to the editor" section of a local newspaper, tend to reinforce the conclusion that a reasonable person could not interpret the letter as an assertion of actual known fact. *See Sall v. Barber, supra; see also Ollman v. Evans,* 750 F.2d 970, 986 (D.C.Cir.1984) ("The reasonable reader who peruses [a] column on the editorial or Op–Ed page is fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper."). As we have previously recognized, letters to the editor are a traditional forum for public debate and the expression of opinion. *See Sall v. Barber, supra; Reddick v. Craig,* 719 P.2d 340 (Colo.App. 1985).

### 2. The "White Collar Crime" Letter

■ Campbell's second letter, entitled *White Collar Crime, Gold Rush of the '80's,* appeared on page 14 of the November 8, 1988, *Fremont Observer.* It begins: "A trial to the court which means no jury, [sic] is used and only a judge renders a decision seems to be open to suspect [sic]." The letter then describes how a "judge is really in a position to clean up financially," if "as an example," the judge approaches an "old buddy, who just committed a heinous crime [and] stands to lose his license to practice law or medicine," and offers to find "a way out" of his dilemma in exchange for a "home in another state" and "some six figure money." "If this could be proven," the letter continues, "it is also called extortion. Using your position, elected or appointed, to line your own pockets is despicable at best and criminal at worst."

Again, we conclude that this letter contains verifiable factual statements or implications about Keohane. The letter states that a judge is in a position to "really clean up" in a trial to the court, and the factual similarities between the Gallagher trial and the "hypothetical" situation set forth in the letter implies that the judge in that case accepted a bribe. Clearly, these statements or implications are capable of being proved true or false. However, viewing the letter in context, we are not persuaded that a reasonable person could understand the letter as actually making an express or implied assertion of a known fact.

Specifically, although the *White Collar Crime* letter does not explicitly refer to any particular event, the factual similarities between Campbell's "hypothetical" and the well-known facts of the Gallagher trial would tend to alert a reasonable reader that the author was commenting on that trial. As with the *Sick Pillars* letter, several witnesses testified that the letter was understood as referring to the Gallagher trial. Thus a reasonable person could not understand this letter as asserting actual facts known to the writer, but inaccessible to the reader; rather, the letter suggests an explanation for events which were well known in the community. As with the *Sick Pillars* letter, the audience remained free to judge the reasonableness of this explanation.

Moreover, the *White Collar Crime* letter is replete with conjectural language, includ-

ing phrases such as "he *can* approach his old buddy with a deal" and "*if* this could be proven." Although the phrasing of a statement in such "terms of apparency" is not dispositive, it would put the reasonable reader on notice that the inferences contained in the letter are speculative and not based upon the knowledge of the author. *See Burns v. McGraw–Hill Broadcasting Co., supra.* Thus, the phrasing of the letter also tends to negate the impression that the writer was actually maintaining a factual assertion. *See Milkovich v. Lorain Journal Co., supra.*

Hence, we conclude that the sum effect of the content, tone, and format of Campbell's letters are reasonably susceptible to interpretation only as an expression of her point of view, not as an assertion of actual known fact. Therefore, Campbell's letters were constitutionally protected and the trial court erred in submitting them to the jury on the issue of defamation.

### III.

Next, defendants argue that, even if the statements were actionable, they were not defamatory, and therefore, the judgment against them must be reversed. Because we have already concluded that Campbell's letters were not actionable, we need not consider whether they were defamatory. *See Living Will Center v. NBC Subsidiary (KCNC–TV), Inc., supra.* Therefore, we limit our discussion to the issue of whether the trial court erred in ruling that Stewart's statements were slanderous per se. We perceive no error in this ruling.

■ A statement is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Burns v. McGraw–Hill Broadcasting Co., supra,* at 1357; Restatement (Second) of Torts § 559 (1977). Language need not prejudice the plaintiff in the eyes of a majority of the community; it is defamatory if plaintiff is prejudiced in the eyes of a substantial and respectable minority of the community. *Burns v. McGraw–Hill Broadcasting Co.,*

*supra;* Restatement (Second) of Torts § 559, comment e (1977).

■ There are two types of defamatory statements: statements which are libelous or slanderous per se, and those that are libelous or slanderous per quod. To be libelous or slanderous per se a statement must be defamatory per se.

A statement may be considered defamatory per se if it is specifically directed at the person claiming injury and, on its face and without extrinsic proof, it is unmistakably recognized as injurious. *Lininger v. Knight,* 123 Colo. 213, 226 P.2d 809 (1951).

■ To determine whether a statement is defamatory per se, the court must examine the statement "alone, without the aid of inducements, colloquialisms, innuendos, and explanatory circumstances." *Inter–State Detective Bureau, Inc. v. Denver Post, Inc.,* 29 Colo.App. 313, 317, 484 P.2d 131, 133 (1971). A plaintiff proceeding under a theory of defamation per se need not plead or prove special damages. *See Inter–State Detective Bureau, Inc. v. Denver Post, Inc., supra.*

■ Historically, a statement constituted defamation per se if it imputed a criminal offense; a venereal or loathsome disease; improper conduct of a lawful trade, business, profession or office; or unchastity of a woman. *See Cinquanta v. Burdett,* 154 Colo. 37, 388 P.2d 779 (1963); *Dorr v. C.B. Johnson, Inc.,* 660 P.2d 517 (Colo.App.1983). Defamation per se has been narrowly construed, and recently this court has noted that per se classifications and presumed damages are not favored. *See Hayes v. Smith,* 832 P.2d 1022 (Colo. App.1991).

■ In contrast, a statement is defamatory per quod if it requires innuendo or extrinsic evidence to establish its defamatory nature, and a plaintiff asserting a claim of slander per quod must plead and prove special damages. *See Bernstein v. Dun & Bradstreet, Inc.,* 149 Colo. 150, 368 P.2d 780 (1962). A finding that a statement is defamatory per quod must be predicated on the context of the entire state-

ment and the common meaning of the words utilized. *See Burns v. McGraw-Hill Broadcasting Co., supra.*

■ Whether a statement is to be considered slander per se or per quod is a question of law. *Cinquanta v. Burdett, supra.*

■ Here, Stewart's statements unmistakably relate to the commission of a criminal offense, *i.e.*, accepting a bribe or use of drugs, or to improper conduct in office. In addition, the trial court found that "there is no possibility of confusing who the statement was about." Based upon these findings, the trial court instructed the jury as to slander per se. We perceive no error in this ruling.

■ It is immaterial whether Jurgens, the party to whom the statements were made, considered the statement defamatory. Rather, "[i]t is enough that the communication would tend to prejudice [plaintiff] in the eyes of a substantial and respectable minority" of the community. Restatement (Second) of Torts § 559, comment e (1977); *see also Burns v. McGraw-Hill Broadcasting Co., supra; cf. Cinquanta v. Burdett, supra* (whether language is offensive to the recipient does not itself make the words slanderous per se). Moreover, if a statement imputes criminal activity or improper conduct in office, the words are presumed to be defamatory. *See Inter-State Detective Bureau, Inc. v. Denver Post, Inc., supra.*

Further, because it was uncontroverted that Jurgens understood that Stewart's remarks were directed at Keohane, extrinsic evidence was not required. "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." Restatement (Second) of Torts § 564 (1977). Further, because the statements, as a matter of law, unmistakably refer to the criminal conduct of accepting a bribe, extrinsic evidence was not required to establish the defamatory nature of the statements. Therefore, the trial court did not err in instructing the jury as to a theory of slander per se.

## IV.

Defendants also contend that Keohane, as a public figure plaintiff, should not be permitted to recover actual damages from Stewart on his claim for slander per se because only one person, Jurgens, heard the comment and he did not believe it to be true. We disagree.

■ Unlike a private figure plaintiff, a public figure asserting a claim for slander per se must establish actual damages. *See Rowe v. Metz*, 195 Colo. 424, 579 P.2d 83 (1978). Actual damages may be established by, among other things, evidence of harm to reputation, personal humiliation, mental anguish and suffering, or physical suffering. *See Bolduc v. Bailey*, 586 F.Supp. 896 (D.Colo.1984); *CJI–Civ.3d* 22:12 (1989).

■ That a defamatory statement is made to one person will not preclude recovery of actual damages; the number of people hearing the defamatory statement is relevant to the amount, not the fact, of damages. *See Bolduc v. Bailey, supra* (defamatory statement initially made to one member of defendant's religious organization, then transmitted to others); *CJI–Civ.3d* 22:23 (1989) (concerning repetition of defamatory statements).

Here, Keohane testified that following the publication of the *Daily Record* article, in which Stewart was alleged to have stated, "There's the best judge money can buy," Keohane contacted Jurgens, whereupon he learned that Stewart had asked Jurgens whether Keohane had been "paid off" with cocaine or cash. Keohane further testified that he was "devastated" by the *Daily Record* article and that learning of the additional allegations that he had accepted a bribe made him feel worse.

■ Although damages for humiliation and mental anguish are difficult to evaluate, *see Rowe v. Metz, supra,* Keohane's testimony is sufficient to permit the jury to conclude that he suffered actual damage. *See Bolduc v. Bailey, supra.* Moreover, in light of the facts in the record, we conclude

that the jury's award of damages is not "grossly and manifestly excessive," and therefore, we will not disturb it on review. *See Zertuche v. Montgomery Ward & Co.,* 706 P.2d 424, 428 (Colo.App.1985).

## V.

Finally, defendants contend that the trial court's order changing venue was procedurally flawed because no formal motion or affidavit had been filed at the time the court granted the motion. These procedural flaws, they contend, obligated the El Paso County district court to return venue to the Fremont County district court, and therefore, the judgment of the trial court must be reversed. Again, we disagree.

Although venue may be proper in the district where an action is brought, a court may, on motion or its own initiative, order a change of venue if the convenience of the parties or witnesses or the ends of justice so require. C.R.C.P. 98(e), (f), (g). The existence of prejudice justifying a change of venue is a question of fact within the discretion of the trial court, *Nowels v. People,* 166 Colo. 140, 442 P.2d 410 (1968), and the moving party bears the burden of establishing such prejudice by affidavit or evidence. *Colorado Department of Highways v. District Court,* 635 P.2d 889 (Colo. 1981). The grant of a motion for change of venue in such a case is discretionary and will not be reversed on review absent a clear showing of an abuse of that discretion. *Weston v. Mincomp Corp.,* 698 P.2d 274 (Colo.App.1985).

Here, at the hearing on the motion to change venue, a majority of the defendants, through their counsel, stipulated to the difficulty of obtaining a fair trial in Fremont County. Specifically, they stipulated that Keohane's prior employment as a judge in Fremont County and the wide publicity surrounding the Gallagher trial and the indictment of a local district attorney for the use and distribution of cocaine would make it difficult to empanel an impartial jury. In addition, they stipulated that publicity surrounding the *Fremont Observer* and other articles involving cor-

ruption published therein would also make it difficult to empanel an impartial jury.

Although all parties did not stipulate to the change of venue within the meaning of C.R.C.P. 98(i), the facts stipulated to by a majority of the defendants provided sufficient good cause for the change of venue. Therefore, under these circumstances, although no supporting affidavits were filed and no evidence on the issue of prejudice was received, the trial court did not abuse its discretion in relying on the facts stipulated to by a majority of the defendants. *Cf. Ranger Insurance Co. v. District Court,* 647 P.2d 1229 (Colo.1982).

Moreover, defendants do not allege on appeal that they suffered any prejudice to their substantial rights as a result of the change of venue. Thus, procedural flaws in the trial court's order changing venue, if any, would constitute harmless error. *Cf. Western Wood Products v. Tittle,* 79 Colo. 473, 246 P. 791 (1926).

Because our resolution of these issues completely disposes of this appeal, we need not address the additional arguments raised by the parties.

The judgment of the trial court is reversed insofar as it awards damages for libel against Campbell and Wilkerson. Insofar as it awards damages for slander against Stewart, the judgment is affirmed.

METZGER and BRIGGS, JJ., concur.