# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00102-SCT

*DOUGLAS B. HAMILTON*

*v.*

*JOHNNY HAMMONS, KENT LUCKEY, MIKE BROWN, BUDGIE WALLACE AND BILL LOWERY*


| | |
|---|---|
| DATE OF JUDGMENT: | 09/27/1999 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | HUGH GILLON |
| ATTORNEY FOR APPELLEES: | W. TERRELL STUBBS |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 08/23/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/13/2001 |

**BEFORE PITTMAN, C.J., DIAZ AND EASLEY, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. On August 6, 1997, plaintiffs Johnny Hammons ("Hammons"), Kent Luckey ("Luckey"), Mike Brown ("Brown"), Budgie Wallace ("Wallace") and Billy Lowery ("Lowery") filed a complaint against Douglas B. Hamilton, ("Hamilton") and DDL Enterprises, Inc., a Mississippi Corporation d/b/a Nozzle Reconditioning, Inc., in the Circuit Court of Simpson County. The complaint alleged that Hamilton made libelous, slanderous and defamatory statements about them to the news media in Simpson County, the Simpson County Sheriff's Office, and other people in the community.

¶2. The case was tried beginning on September 15, 1999. The jury returned a unanimous verdict on September 16, 1999, in favor of the plaintiffs assessing damages of $50,000.00 each to Hammons, Luckey, Brown, Wallace and Lowery. The Magee Courier/Simpson County News was found to be twenty percent (20%) negligent and Hamilton eighty percent (80%) negligent. A judgment of $40,000.00 each for Hammons, Luckey, Brown, Wallace and Lowery was awarded against Hamilton, plus costs and interest.

¶3. On October 1, 1999, Hamilton filed his Motion for Judgment Not Withstanding the Verdict, or in the Alternative New Trial, or in the Alternative Remittitur. The trial court denied Hamilton's motion on December 16, 1999. On January 14, 2000, Hamilton filed his notice of appeal.

## FACTS

¶4. In the early morning hours of July 27, 1997, Hamilton and his wife were in their mobile home near Pinola, Mississippi, when they were awakened by the sound of gunfire striking their home. Hamilton looked out his window and saw headlights and taillights.

¶5. Hamilton called 911, and within twenty minutes or so, Deputy Rick Neely ("Deputy Neely") from the Simpson County Sheriff's Department arrived to investigate. Deputy Neely questioned Hamilton whether anything had happened to him recently. Hamilton told Deputy Neely that he had filed a lawsuit against Hammons, Luckey, Brown, Wallace and Lowery.

¶6. Deputy Neely went back to Hamilton's home the next day to do further investigation. Deputy Neely also interviewed all five people named by Hamilton, namely Hammons, Luckey, Brown, Wallace and Lowery.

¶7. Hamilton contacted Pat Brown, editor of the local newspaper, The Magee Courier/Simpson County News, to place an advertisement offering a reward for information related to the shooting. Brown arranged for Hamilton to talk to his reporter, Forrest Hailey ("Hailey"). Hamilton told Hailey that he had filed a lawsuit for breach of a non-competition agreement against Hammons, Luckey, Brown, Wallace and Lowery. Hailey asked Hamilton "if he thought the filing of the lawsuit was the reason for his house being shot up and did he think those folks would retaliate in such a way." According to Hailey, Hamilton's response was, "Sure, I do."

¶8. Hammons, Luckey, Brown, Wallace and Lowery filed suit on August 6, 1997, seeking $3 million actual damages and $3 million punitive damages against Hamilton. Hamilton answered the complaint on or about September 12, 1997.

¶9. At trial, Hammons, Luckey, Brown, Wallace and Lowery, along with Brown's wife, Luckey's wife and Wallace's wife, testified as to the alleged damage to their reputation and emotional and mental well being. No medical evidence or medical or pharmacy bills were produced in support of any damages. No proof of economic loss as a result of the alleged defamation was presented. Hamilton argued at trial that his statement of opinion made to both Deputy Neely and Hailey were based on true, non-defamatory facts.

¶10. On appeal Hamilton raises the following issues:

**I. Whether the statements made by Hamilton were defamation?**

**II. Whether it was error for the Court to grant modified jury instruction D-7A?**

**III. Whether the size of the jury pool deprived Hamilton of a fair and impartial jury?**

**IV. Whether the jury's verdict was against the great weight of evidence, and Hamilton was entitled to a JNOV, new trial or in the alternative, remittitur?**

## DISCUSSION

### I. STATEMENTS

¶11. This Court has established that to prove defamation the following four elements must be proven:

(1) a false and defamatory statement concerning the plaintiff;

(2) unprivileged publication to a third party;

(3) fault amounting at least to negligence on part of the publisher;

(4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication.

*Franklin v. Thompson*, 722 So.2d 688, 692 (Miss. 1998).

¶12. In the case sub judice, Hamilton spoke to Deputy Neely, the investigating officer, and Hailey, the newspaper reporter, about the shooting. Deputy Neely asked Hamilton whether he "knew of anyone who would try to do something like that to him, been having any problems or anything like that." In response to the question, Hamilton stated that he had recently filed a lawsuit against Hammons, Luckey, Brown, Wallace and Lowery. Hamilton explained to Hailey the basis of the lawsuit. Hailey asked Hamilton "if he thought the filing of the lawsuit was the reason for his house being shot up and did he think those folks would retaliate in such a way." Hamilton's response to the question was only "Sure, I do."

¶13. Hamilton's responses were tied to the prompting by both Deputy Neely and Hailey. In the response to Deputy Neely, the statement was only that he had been having problems with Hammons, Luckey, Brown, Wallace and Lowery that resulted in recent a lawsuit being filed.

¶14. The statement made by Hamilton in response to Hailey's question whether he thought the filing of the lawsuit was the reason for the shots fired at his house never appeared in the newspaper article. The newspaper did not print anything that named Hammons, Luckey, Brown, Wallace and Lowery as having anything to do with the shooting.

¶15. Hamilton took out an advertisement in the local newspaper offering a reward for any information in connection with the shooting. The advertisement never named or accused anyone of the shooting.

¶16. This Court has repeatedly recognized the common law rule that:

Any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se.

*Ferguson v. Watkins*, 448 So.2d 271, 275 (Miss. 1984). In *Ferguson*, this Court set out two restrictions for defamation which must be strictly enforced as follows:

First, the words employed must have clearly been directed toward the plaintiff. Beyond that, the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture.

*Id*. *See Franklin*, 722 So.2d at 692. While there is no such thing as a libelous idea, a statement in the form of an opinion can still constitute a defamatory communication. *Ferguson*, 448 So.2d at 275-76. In *Ferguson*, this Court stated that "opinion statements are actionable only if they clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion." *Id*. (citing

Restatement (Second) of Torts § 566 (1977)). A defamatory statement, even if phrased as an opinion, is not constitutionally protected if the court finds that its "substance or gist could reasonably be interpreted as declaring or implying assertion of fact." *Roussel v. Robbins*, 688 So.2d 714, 723 (Miss. 1996). *See Keohane v. Wilkerson*, 859 P.2d 291, 297 (Colo. Ct. App. 1993), *aff'd sub nom. Keohane v. Stewart*, 882 P.2d 1293 (Colo. 1994).

¶17. In responding to two questions, one from an officer investigating a shooting, the other from a newspaper reporter writing a story, Hamilton stated three things:

(1) Hamilton stated the obvious. Someone did fire shots into his home.

(2) Hamilton pointed out to each questioner a matter of public record: the existence of the chancery court lawsuit filed against Hammons, Luckey, Brown, Wallace and Lowery. This was, and is, an objective fact.

(3) Hamilton was asked by both the officer and the reporter whether he, *thought* there could be any connection between the litigation and the shooting. Hamilton responded in the affirmative, stating his opinion which was based on objective, truthful, non-defamatory facts.

¶18. In *Franklin*, 722 So.2d at 690, this Court addressed the issue of opinions as defamatory statements. *Franklin* involved a disagreement between a law enforcement officer, Thompson, and a justice court judge, Judge Franklin, over the dismissal of a DUI case. *Id*. at 690. On his own time, Thompson conducted surveillance of Judge Franklin's home and photographed two of her vehicles with switched car tags. *Id*. Judge Franklin's 1990 Lexus, which had an expired tag, had the tag from her husband's 1979 Chevrolet Caprice. *Id*. The Lexus stayed mainly on blocks in Judge Franklin's front yard, but her husband did drive the car to his place of employment. *Id*. at 691. Thompson photographed the Lexus at the husband's place of employment. *Id*.

¶19. During Judge Franklin's reelection campaign, Thompson turned the photographs over to her opponent, Hurdle. *Id*. "The relevant inquiry is whether the statement could be reasonably understood as declaring or implying a provable assertion of fact." *Roussel*, 688 So.2d at 714. Thompson told the opponent that he did not see Judge Franklin driving the vehicles with the switched tags, and he did not know if she knew the plates were switched. Rather, Thompson said he <u>believed</u> that either Judge Franklin did not know that the plates had been switched and that she had operated the car with the swapped tags, or she knew it was being operated with the swapped tags. *Id*. at 693-94.

¶20. This Court concluded that Thompson's opinions were based on disclosed, truthful, non-defamatory facts such that his opinions concerning his beliefs which did not rise to the actionable level as required under the current law. *Id*. at 694-95. This Court in *Franklin*, stated as follows:

Given the fact that Thompson told Hurdle that he did not see Judge Franklin driving the Lexus and that he did not know if she knew that the plates were switched, it is unreasonable to conclude that Hurdle's interrogatory response, assuming that it is true, could be viewed as implying or declaring that Thompson could prove either that she drove the car with the illegal license plate or that she knew of the switch. As a matter of law, the statement made by Thompson does not rise to the level of an actionable opinion.

*Id*. at 693-94.

¶21. In the case sub judice, Hamilton's statements as to what he believed in response to questions proposed by Deputy Neely and the reporter, Hailey, were based on objective, verifiable facts and do not rise to the level of an actionable opinion. Neither the advertisement run at Hamilton's request nor the newspaper articles ever stated that Hamilton accused Hammons, Luckey, Brown, Wallace or Lowery as being responsible for the shots fired at his house.

¶22. Anyone in Hamilton's position would have reasonably believed that Hammons, Luckey, Brown, Wallace and Lowery were responsible for the shooting due to their past dispute that resulted in Hamilton's litigation. Accordingly, as a matter of law, the statements made by Hamilton do not rise to the level of an actionable opinion to prove defamation. Therefore, since the evidence was insufficient to prove defamation, the trial court erred in denying Hamilton's JNOV motion.

## II. MODIFIED JURY INSTRUCTION D-7A

¶23. While the modified instruction D-7A appears to substantially mirror the one refused by the trial court, the court altered Hamilton's D-7 by adding the following clause, "It is for the jury to determine whether such opinions are reasonable." Moreover it primarily altered D-7 by adding the word "reasonably" in the first and second paragraph of the instruction as emphasized below. The two instructions specifically read as follows:

| | |
|---|---|
| Jury Instruction D-7 | Statements of opinion based on truthful non-defamatory facts which are disclosed or otherwise generally known to the audience, cannot be defamatory. |
| | Therefore, if you find that Doug Hamilton made certain statements of opinion regarding the Plaintiffs, and those opinions were based upon truthful, non-defamatory facts which were disclosed or otherwise generally known to the audience, you must find for the Defendant in this case. |
| Jury Instruction D-7A | Statements of opinion _reasonably_ based on truthful non-defamatory facts which are disclosed or otherwise generally known to the audience, cannot be defamatory and _it is for the jury to determine whether such opinions are reasonable_. |
| | Therefore, if you find that Doug Hamilton made statements of opinion regarding the Plaintiffs, and those opinions were _reasonably_ based on truthful, non-defamatory facts which were disclosed or otherwise generally known to the audience, you must find for the Defendant in this case. |

(emphasis added).

¶24. The case law leading up to establishing the position that "an allegedly defamatory statement, even if

phrased as an opinion," will not automatically enjoy constitutional protection was based on a reasonable interpretation of the declaration. *Roussel*, 688 So.2d at 723. *See Milkovich v. Lorain Journal Co.*, 497 U.S.1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Keohane*, 859 P.2d at 295-96.

¶25. The trial court was correct in stating that an opinion must, at least, be reasonably based on those non-defamatory facts. There must be some relationship. The modified jury instruction D-7A given by the trial court did not constitute reversible error.

### III. JURY POOL

¶26. Hamilton's attorney, Hugh Gillon ("Gillon"), objected to the size of the jury pool at voir dire. Gillon expressed concerns that there were five local plaintiffs, one local defendant and a local lawyer who all lived and worked in that area which could impact his ability to seat a jury that neither knew any person involved in the case nor heard about the case. Gillon also expressed concern that the trial court may be less lenient to give strikes for cause in this case than it would if there was a larger jury pool.

¶27. Out of all the persons who were summoned to appear for jury duty only twenty-five potential jurors showed up for trial. Of those twenty-five potential jurors, the court excused Juror 8 because she was subpoenaed to appear in another court on the day following the beginning of this trial. Further, the court excused Juror 10 because she was employed by the defendant, DDL Enterprises, Inc. d/b/a Nozzle Reconditioning, Inc. Thus, the parties were left with a venire panel of twenty-three potential jurors.

¶28. During voir dire, several of the twenty-three potential jurors noted that they knew one of the five plaintiffs or counsel for the plaintiffs, Terrell Stubbs ("Stubbs"). Moreover, some of those potential jurors further stated that if they had to hire a lawyer, they would hire Stubbs.

¶29. Accordingly, when the parties and the trial court began the jury selection process, counsel for Hamilton moved to continue the trial. In support of the motion, counsel for Hamilton argued that the jury pool was very small, and this fact was acknowledged by the trial court. Hamilton's counsel expressed concerns regarding the connections between some of the jurors and the plaintiffs and/or their counsel.

¶30. The trial court did acknowledge that the small size of the jury pool could cause the court to be less lenient to grant strikes for cause. Further, the trial court noted that it was inclined to continue the case if the parties could agree to set the case later in the same term. However, Hamilton's counsel had a conflict with the date proposed by the trial court. The motion to continue the trial was denied.

¶31. Hamilton's counsel raised six challenges to strike for cause, Juror 3, Ida Riley; Juror 9, Sheila Phelps; Juror 12, J. W. Turner; Juror 16, John Lott; Juror 22, Rosetta Hayes; and Juror 24, Kathy Pittman. The trial court only struck Juror 12, J. W. Turner, and Juror 22, Rosetta Hayes, for cause. Juror 9, Sheila Phelps, stated that if she had to hire an attorney she would hire Terrell Stubbs.

¶32. The trial court recognized in the record that if the court had "granted [counsel's for Hamilton] motions to strike for cause, we wouldn't have had a jury picked." After using their peremptory challenges, the twelve jurors that ultimately decided the case at bar included only one of the jurors Hamilton attempted to strike for cause, Juror 9, Sheila Phelps.

¶33. In *Hudson v. Taleff*, 546 So.2d 359, 362-63 (Miss. 1989), this Court stated:

Respect for the sanctity of an impartial trial requires that courts guard against even the appearance of unfairness for 'public confidence in the fairness of jury trials is essential to the existence of our legal system. Whatever tends to threaten public confidence in the fairness of jury trials, tends to threaten one of our sacred legal instructions.'

(quoting *Mhoon v. State*, 464 So.2d 77, 81 (Miss. 1985)). The right to a jury trial in civil cases is based on Mississippi Constitution Article 3, § 31, trial by jury, which provides in pertinent part as follows: "The right of trial by jury shall remain inviolate...." This Court has held that "under this constitutional provision, it is the duty of the court to see that a competent, fair and impartial jury is impaneled." *Marshall Durbin, Inc. v. Tew*, 381 So.2d 152, 154 (Miss. 1980); *Mississippi Power v. Stribling*, 191 Miss. 832, 845, 3 So.2d 807, 810 (1941).

¶34. This Court in *Toyota Motor Corp. v. McLaurin*, 642 So.2d 351, 356 (Miss. 1994), addressed the two competing forces that enter into the equation as to the impartiality of a juror. The "two forces are first the factor or circumstance which tends to indicate a potential for bias on the part of that juror and secondly the juror's promise that he or she can and will be impartial." *Id*. This Court had previously stated:

> To the extent that any juror, because of his relationship to one of the parties, his occupation, his past experience, or whatever, would normally lean in favor of one of the parties, or be biased against the other, or one's claim or the other's defense in the lawsuit, to this extent, of course, his ability to be fair and impartial is impaired. It should also be borne in mind that jurors take their oaths and responsibilities seriously, and when a prospective juror assures the court that, despite the circumstance that raises some question as to his qualification, this will not affect his verdict, this promise is entitled to considerable deference ... These varied imponderables make selection of jurors a judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion.

*Scott v. Ball*, 595 So.2d 848, 850 (Miss. 1992)(citing *Harding v. Estate of Harding*, 185 So.2d 452, 456 (Miss. 1966); *Howell v. State*, 107 Miss. 568, 65 So. 641, 642 (1914)).

¶35. Hamilton's counsel was concerned about the number of jurors that stated that if they had to hire an attorney they would hire Stubbs. Others stated that Stubbs had represented or was representing a family member on another matter. In the record, Hamilton's counsel even alluded to *McLaurin.*

¶36. In *McLaurin*, over sixty percent (60%) of the jury pool, 24 out of the 39 members, had some type of relationship with the plaintiff in the case or the plaintiff's attorney. *McLaurin*, 642 So.2d at 655. Of those members with relationships to the plaintiff, 22 of the potential jurors or their family members had been previously represented by the attorney for the plaintiff, Gene Tullos, or were currently being represented by Tullos. Also, 14 of the panel members stated that they either regarded Tullos as their lawyer or would go to Tullos if they needed legal assistance. *Id*. at 355-56. After the peremptory challenges had been exercised, the "jury consisted of eight (8) persons whom either he/she or a family member had been represented by Tullos. Also, six (6) of these jurors regarded Tullos as their lawyer and would go to him if they needed an attorney. All of the jurors impaneled stated either in open court or in chambers that they could be fair and impartial."*Id*. at 356. The trial judge overruled the motion for a mistrial. *Id*. This Court stated the fact that the county was sparsely populated and Tullos is a well-known lawyer in "no way diminishes the trial court's obligation to ensure the litigants before it that their case will be heard and decided by a fair and impartial jury."*Id*. at 358. This Court went on to say that this Court is "not holding that a prospective juror who

either he/she or a family member has been represented by an attorney in the present litigation in the past is *per se* precluded from serving on that jury. The key is to look to see if the 'statistical aberration' and the potential for undue influence is just simply too great." ***Id.***

¶37. In the case sub judice, after the use of the peremptory challenges, only one of the jurors that Hamilton attempted to remove for cause survived on the jury panel of twelve that decided the case. Juror 9, Sheila Phelps, indicated that if she needed an attorney she would go to Stubbs, and she stated that "he is excellent as far as children and [custody matters]." The only juror that remained on the jury had not used the plaintiffs' attorney, Stubbs, but only stated that if she needed an attorney she would use Stubbs.

¶38. The composition of the jury venire panel did not constitute reversible error.

## IV. JUDGMENT NOTWITHSTANDING THE VERDICT, NEW TRIAL OR REMITTITUR

¶39. The issues that Hamilton raised on appeal in support of the judgment notwithstanding the verdict ("JNOV") and for a new trial have already been specifically addressed by this Court in determining whether the statements made by Hamilton constituted defamation and whether Hamilton's jury instruction D-7 should have been given. It is not necessary for this Court to go through those same arguments and facts again. However, the Court will briefly address the argument that a JNOV or a new trial should have been granted.

¶40. This Court in ***General Tire & Rubber Co. v. Darnell***, 221 So.2d 104, 105 (Miss. 1969), stated that the established rule when the Court considers whether a jury verdict should be disturbed as a matter of law, the Court should consider the evidence in the light most favorable to the non-movant, disregarding any evidence on the part of the movant in conflict with that favorable to the non-movant, and determine if the evidence and reasonable inferences to be drawn therefrom would support a verdict for the movant. *See* ***Paymaster Oil Mill Co. v. Mitchell***, 319 So.2d 652, 657 (Miss. 1975).

¶41. This Court in ***City of Jackson v. Locklar***, 431 So.2d 475, 478 (Miss. 1983) stated as follows:

On a motion for judgment notwithstanding the verdict, the trial court must consider all of the evidence-not just that evidence which supports the non-movant's case-but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable men could not have arrived at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgement might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand.

¶42. When a trial judge refuses to grant a motion for JNOV, this Court examines all of the evidence, not just evidence supporting the non-movant's case, in the light most favorable to the party opposing the motion. ***C & C Trucking Co. v. Smith***, 612 So.2d 1092, 1098 (Miss. 1992).

¶43. In ***C & C Trucking Co.***, this Court stated that:

It is only when a directed verdict at the close of the plaintiff's case and again at the close of the defendant's case, would have been proper that a judgment notwithstanding the verdict is proper. Such is not the standard where the trial court is required to use its discretion in granting a motion for a new trial. The variance in proof needed to support these motions is easily explained when one recognizes

that a JNOV terminates the case, whereas a new trial simply give both parties the opportunity to relitigate the controversy.

*Id*. at 1098-99 (citing ***Stubblefield v. Jesco, Inc.***, 464 So.2d 47, 55 (Miss. 1984)).

¶44. The motion for a new trial has only been employed in "rare cases when there would be injustice either in allowing the verdict to stand or in granting a j.n.o.v." ***C & C Trucking Co.***, 612 So.2d at 1099. Miss. R. Civ. P. 59 authorizes a trial judge to set aside a jury verdict and to grant a new trial as justice requires. Circumstances in which a new trial may be granted are "when the verdict is against the overwhelming weight of the evidence, or when the jury has been confused by faulty jury instructions, or when the jury has departed from its oath and its verdict is a result from bias, passion, and prejudice." ***Bobby Kitchens, Inc. v. Miss. Ins. Guar. Ass'n***, 560 So.2d 129, 132 (Miss. 1989); ***Clayton v. Thompson***, 475 So.2d 439, 443 (Miss. 1985); ***Griffin v. Fletcher***, 362 So.2d 594, 596 (Miss. 1978). The trial judge's denial of a request for a new trial will only be reversed by the Court when such denial amounts to an abuse of the trial judge's discretion. ***Bobby Kitchens, Inc.***, 560 So.2d at 132; ***Maxwell v. Illinois Cent. Gulf R.R.***, 513 So.2d 901, 908 (Miss. 1987). This Court's review of the trial judge's discretion and authority is "limited to an inquiry whether the ruling of the trial judge may be fairly characterized as an abuse of discretion." ***Id***. *See* ***Dorris v. Carr***, 330 So.2d 872, 873-74 (Miss. 1976). This Court gives substantial weight, deference and respect to the decision of the trial judge. ***C & C Trucking Co.***, 612 So.2d at 1099.

¶45. Since the statements made by Hamilton do not constitute defamation, the other issues presented for JNOV or a new trial are moot.

¶46. Hamilton also raises the issue of remittitur on appeal. The authority of a trial court to grant a remittitur is found in Miss. Code Ann. § 11-1-55 (1991), as follows:

> The supreme court or any other court of record in case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.

This Court in ***Odom v. Roberts***, 606 So.2d 114, 121 (Miss. 1992), stated the options available to the plaintiff or defendant in the case of a remittitur or additur as follows:

> [I]n the case of a remittitur, that is, where the trial court has granted a remittitur, or, in the alternative, a new trial on the issue of damages only, the plaintiff only may elect (1) to reject the remittitur and have the case retried on the issue of damages only, (2) to appeal to this court on grounds the circuit court should not have granted the remittitur at all, or, alternatively, the remittitur granted was legally excessive, or, (3) to accept the remittitur. In such a case the defendant's only procedural avenue is that it may (cross) appeal to this court arguing that the trial court abused its discretion and that the remittitur was legally inadequate.

Where the trial court has granted an additur, or, in the alternative, a new trial on the issues of damages only, the defendant only may elect (1) to reject the additur and have the case retried on the issue of damages only, (2) to appeal to this court on grounds the circuit court should not have granted the additur at all, or alternatively, the additur granted was legally excessive, or, (3) to accept the additur and pay the judgment. The plaintiff can only (cross) appeal to this court arguing that the trial court abused its discretion and that the additur is legally inadequate.

¶47. Given our disposition of issue I, the issue of remittitur is also moot.

## CONCLUSION

¶48. For these reasons, the judgment of the Simpson County Circuit Court is reversed, and judgment is rendered in favor of Douglas B. Hamilton that plaintiffs Johnny Hammons, Kent Luckey, Mike Brown, Budgie Wallace, and Bill Lowery take nothing and that their complaint and this civil action are finally dismissed with prejudice.

¶49. **REVERSED AND RENDERED**.

**PITTMAN, C.J., SMITH, MILLS, WALLER AND DIAZ, JJ., CONCUR. BANKS, P.J., CONCURS IN PART I. COBB, J., CONCURS IN RESULT ONLY. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**McRAE, PRESIDING JUSTICE, DISSENTING**:

¶50. The majority errs by finding that Hamilton's words to the reporter, Hailey, do not constitute defamation. Hamilton's words did not rise to the level of libel or slander when he spoke to the investigating officer, Deputy Neely, but his words did constitute that level when he spoke to the newspaper reporter, Hailey. Hamilton's words to Hailey constituted slander and because they were printed in the newspaper he was libel. For these reasons, I would affirm the judgment based on the jury verdict in this case; and therefore, I dissent.

¶51. In ***McGehee v. DePoyster***, 708 So. 2d 77 (Miss. 1998), the principal of the Richton Elementary School, McGehee, brought a defamation action against the superintendent of the school district, DePoyster. DePoyster spoke to a television station and a local newspaper and stated that McGehee had violated school policy by her methods of punishment for children in her charge. The newspaper reported that McGehee had utilized, "questionable disciplinary techniques." *Id.* at 78. We held that DePoyster was acting outside the course and scope of his employment when he spoke to the newspaper and the television station, instead of resolving the matter internally within the school district. *Id.* at 80.

¶52. Hailey testified that the newspaper article was printed in both the Simpson County News and the Magee Courier on July 31, 1997. Hailey based these articles substantially upon notes he had taken during a telephone conversation with Hamilton. These notes were admitted into evidence, with no objection raised by Hamilton, as exhibit D-3. The newspaper articles from the Magee Courier and the Simpson County News were stipulated to by the parties and were admitted into evidence as exhibits A and B, respectively.

¶53. The newspaper articles follow Hailey's notes almost verbatim. In these articles, Hailey writes about the details of the shooting incident as described to him by Hamilton. Following these paragraphs, Hailey also writes that,

Hamilton recently filed lawsuits totaling more than $3 million dollars against Johnny Hammons (former owner of Nozzle Reconditioning), Kent Lucky, Mike Brown, Billy Lowery (all former employees of Nozzle Reconditioning) and Budgie Wallace, now doing business in Magee as Wallace Fuel Injection Repair (Wallace purchased some equipment and machinery from Johnny Hammons).

¶54. Following this paragraph, Hailey quotes Hamilton, who explains the reasoning behind the lawsuit as, "I filed the lawsuits against those people because they have violated an agreement they signed with me limiting the amount of work they could do in the repair of injectors."

¶55. What you have in these articles is a detailed description of the shooting incident, followed by an explanation that Hamilton recently filed a very expensive lawsuit against five named individuals and Hamilton's quote as to the reason for his filing suit. Hailey testified that he did not even verify with the clerk of the court whether this lawsuit had been filed by Hamilton. It is clear that Hamilton's words constituted libel against the plaintiffs in this case, and his spoken words to the reporter constituted slander against these men.

¶56. In fact, these words fall within one of the categories of slander per se, as they go to "words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business." *W.T Farley, Inc. v. Bufkin*, 159 Miss. 350, 132 So. 86, 87 (1931). Since Hamilton's words constituted slander per se, no proof of special damages is required.

¶57. The majority sets forth the elements of a defamation cause of action as follows:

(1) a false and defamatory statement concerning the plaintiff;

(2) unprivileged publication to a third party;

(3) fault amounting at least to negligence on part of the publisher;

(4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication.

*Franklin v. Thompson*, 722 So.2d 688, 692 (Miss. 1998) (citations omitted).

¶58. All four elements are met in this case. Hamilton made defamatory statements about the plaintiffs when he stated to Pat Brown, the editor and publisher of the newspaper, and to Hailey, that the five men were responsible for the shooting at his house. Hamilton also made an unprivileged publication to a third party with his telephone call to the newspaper explaining the reason for placing his reward ad and in telling his story to Hailey. Hailey testified that he did not confirm whether or not a lawsuit had been filed, and this shows the fault on the part of the publisher, the newspaper. Finally, the statement is actionable regardless of whether special harm is shown.

¶59. A defamatory statement is "[a]ny written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community." *Franklin*, 722 So. 2d at 692 (citing *Fulton v. Mississippi Publishers Corp*., 498 So.2d 1215, 1217 (Miss.1986) (quoting *Ferguson v. Watkins*, 448 So.2d 271, 275 (Miss.1984)). "The statement must have clearly been directed toward the plaintiff, and 'the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo,

speculation, or conjecture.'" ***Franklin***, 722 So. 2d at 692 (citing ***Ferguson***, 448 So.2d at 275). I also agree when the majority states that, "a defamatory statement, even if phrased as an opinion, is not constitutionally protected if the court finds that its 'substance or gist could reasonably be interpreted as declaring or implying an assertion of fact.'" ***Roussel v. Robbins***, 688 So. 2d 714, 723 (Miss. 1996) (citing ***Keohane v. Wilkerson***, 859 P.2d 291, 297 (Colo. Ct. App. 1993), *aff'd sub nom.* ***Keohane v. Stewart,*** 882 P.2d 1293 (Colo. 1994)). From Hamilton's statements to Brown and Hailey, it is clear that Hamilton implied that the five plaintiffs had reason and motive to commit the shooting incident that occurred at his house. Hamilton clearly made defamatory statements regarding the five plaintiffs, and the judgment entered on the jury verdict should be affirmed. Hamilton had a right to report the incident and any possible motives to Deputy Neely, but he went too far when he enlightened the media as to his suspicions. Hamilton's words to Hailey were slander, and these words were also libel when Hailey printed them in articles which ran in two local newspapers. For these reasons, I would affirm the trial court in this case; and therefore, I dissent.